## PATTERSON *v.* BANK OF BRITISH COLUMBIA.
### [S. C. 38 Pac. 817.]

APPLICATION OF PAYMENTS—ACCOMMODATION MAKER OF PROMISSORY NOTE. —Where a number of persons have given their negotiable promissory notes, for the accommodation of the payee, to enable it to obtain advances from a bank, any one of such note makers may at any time end his further liability by notifying the payee and the bank of such desire. He thereby fixes his liability, and his note, together with the others, stands as security for the advances then made; but he cannot claim in diminution of such advances money paid by the accommodation payee to the bank after his revocation of the accommodation contract, where such money is the pro-

NOTE.—Mr. Justice WOLVERTON concurred in the decree dismissing the bill, but upon different grounds.

ceeds of the business of the payee conducted on money advanced on the credit of the remaining note makers. Such money should be first applied to the repayment of the advances made after the retiring note maker fixed his liability by notice.

APPEAL from Multnomah: LOYAL B. STEARNS, Judge.

This is a suit commenced by T. Patterson November twenty-sixth, eighteen hundred and ninety-three, against the Bank of British Columbia, the Portland Smelting and Refining Works, and twenty other defendants, who are styled "note makers," to obtain an accounting between the plaintiff and defendant the Bank of British Columbia, and to compel said bank to surrender to plaintiff a certain promissory note given by him February eighth, eighteen hundred and ninety-two, to the Portland Smelting and Refining Works for the sum of fifty-two hundred and eighty-one dollars and twenty-nine cents, and by the smelting company indorsed to the bank. The complaint alleges, in substance: That on the —— day of February, eighteen hundred and ninety-two, said Portland Smelting and Refining Works needed money to carry on certain temporary experiments at its smelting works, and that, in order to enable it to raise funds for said purpose, certain individuals, including the plaintiff, mutually agreed to make and did make and deliver to said company their several promissory notes in amounts aggregating one hundred thousand dollars dated the eighth day of February, eighteen hundred and ninety-two, payable one day after date to the order of the Portland Smelting and Refining Works. The makers' names and the amounts of their several notes so made are as follows: Honeyman, De Hart & Co., fifty hundred and twenty-eight dollars and seventy cents; E. A. Borthwick, thirty-seven hundred and ninety-nine dollars and eight cents; J. McCracken, fifty-two hundred and eighty-one dollars and twenty-nine cents;

L. B. Sturgis, twenty-three hundred and eighty-eight dollars and six cents; L. W. Wallace, fifty-seven hundred and sixty-three dollars and forty-nine cents; G. Pope, fifty hundred and twenty-eight dollars and seventy cents; E. G. Harvey, fifty hundred and twenty-eight dollars and seventy cents; E. Wolf, four hundred and eighty-two dollars and twenty cents; G. W. Staver, forty-seven hundred and ninety-nine dollars and eight cents; A. H. Johnson, seventy-six hundred and sixty-nine dollars and thirty-five cents; R. B. Knapp, forty-seven hundred and seventy-nine dollars and eight cents; K. A. J. McKenzie, forty-seven hundred and ninety-nine dollars and eight cents; John Kiernan, seventy-six hundred and sixty-nine dollars and thirty-five cents; W. W. Spaulding, fifty hundred and twenty-eight dollars and seventy cents; Chas. Heagle, fifty-five hundred and ten dollars and ninety-two cents; J. Ordway, forty-seven hundred and ninety-nine dollars and eight cents; J. C. Bayer, four hundred and eighty-eight dollars and twenty cents; T. Patterson, fifty-two hundred and eighty-one dollars and twenty-nine cents; J. W. Cook, forty-seven hundred and ninety-nine dollars and eight cents; J. Lotan, forty-seven hundred and ninety-nine dollars and eight cents, and H. A. Hogue, fifty-seven hundred and sixty-three dollars and forty-nine cents. The complaint further alleges that the company deposited with said bank all the aforesaid promissory notes as collateral security for whatever overdrafts might be honored or advances made by the bank to said company, not exceeding one hundred thousand dollars; that this arrangement was to continue until said note makers, or any one of them, the bank, or said company, should signify a desire for its termination; that on July eleventh, eighteen hundred and ninety-two, there was due the bank from the said company for money loaned upon the security of said notes the sum of thirteen thousand three hundred and

eighty-seven dollars and eighty-one cents, and no more, and that on said date plaintiff served a notice upon the bank, in writing, of which the following is a copy:—

"PORTLAND, Oregon, July 11, 1892.

*"George Good, Esq., Manager Bank of British Columbia, Portland, Oregon*—DEAR SIR: I have to inform you that I will no longer extend credit to the Portland Smelting and Refining Works Company, and referring to a certain note executed by me in favor of that company dated February eighth, eighteen hundred and ninety-two, for fifty-two hundred and eighty-one dollars and twenty-nine cents due one day after date, which I understand has been deposited with other similar notes of other individuals in your bank as collateral security against overdrafts of that company, I hereby notify you not to make further advances to the company on account of my note. No consideration whatever passed to me from the company mentioned for the note referred to, and it will be observed that the note is now overdue. I have notified the president of the company of my determination in this matter and demanded an adjustment at the bank so far as my note is concerned and a return of the note without delay.

"Yours respectfully,          T. PATTERSON."

It is also alleged that on the same day a like notice was sent to John McCracken, president of the Portland Smelting and Refining Works; that since said July eleventh, eighteen hundred and ninety-two, the said company has made payments to the bank on account of said loans exceeding the amount of said balance of thirteen thousand three hundred, and eighty-seven dollars and eighty-one cents, and that there is nothing due from said company on loans, advances, or overdrafts made and honored by the bank prior to said July eleventh, eighteen hundred and

ninety-two; that since said eleventh day of July, eighteen hundred and ninety-two, said bank has threatened to make other advances and loans to the company upon the security of plaintiff's note, and that since February eighth, eighteen hundred and ninety-two, L. W. Wallace, the maker of one of said notes, has died, and another has become insolvent.

The defendants answer collectively, and deny that the arrangement between the makers of said notes, the said company and the bank was to continue until any one of said makers or the bank signified his or its desire that it should terminate, and allege that prior to the time of making and delivering said notes the plaintiff and the several parties executing the same were each jointly and severally liable to the extent of one hundred thousand dollars for advances that were being made and were to be made by the bank to the said company, and that on said eighth day of February, eighteen hundred and ninety-two, contemporaneously with the execution of said notes, and as part of the transaction, the plaintiff and said other note makers entered into an agreement in writing, by the terms of which they severally recognized their joint and several liability to the extent of one hundred thousand dollars for advances so made and to be made by the bank to the said company, and thereby undertook to define the precise amount for which each was liable, stipulating that in the event of default on the part of any of said note makers the remainder of them would become responsible for and indemnify such of the guarantors of said one hundred thousand dollars for such sum as any one of them should be compelled to pay in excess of his proportion thereof, and thereby recognized the right of the bank to look to any one or more of them, including the plaintiff, for the whole or any portion of said one hundred thousand dollars, and their joint and several liability therefor; that it was further stipu-

26 OR.—65.

lated that said several note makers were to stand together and not withdraw from said agreement, or endeavor to discharge themselves from liability on account thereof, until the business of said company improved to such an extent as to enable it to dispense with the said guaranty, and that the fund thus provided for was required, not only for temporary experiments, but for the general purposes of said company.   The defendants further deny that there is nothing due the bank for overdrafts made prior to July eleventh, eighteen hundred and ninety-two, and aver that said guaranty, by the terms of said agreement, was to be a continuing one, and that whatever balance was due the said bank at any particular time should be covered and secured by said guaranty; that there is now due and owing from the said company to the bank on account of overdrafts the sum of seventy-eight thousand eight hundred and forty dollars and ninety-nine cents.   The reply denies that prior to February eighth, eighteen hundred and ninety-two, said note makers were each jointly and severally liable to the extent of one hundred thousand dollars, etc., and denies the legal effect of the alleged contemporaneous agreement of that date claimed for it by the defendants, and that there is now due the bank from the company the sum of seventy-eight thousand eight hundred and forty dollars and ninety-nine cents or any amount. The case was referred to G. G. Gammans to take testimony and make report of his findings of fact and conclusions of law.

It appears that on June fourth, eighteen hundred and ninety-one, some twenty persons, stockholders of the company, for the purpose of obtaining money from the Bank of British Columbia with which to carry on the business in which said company was engaged, executed to said bank a guaranty for the purpose of securing to it the repayment of such sums of money as the said company might

draw therefrom, not exceeding the sum of one hundred thousand dollars, of which the following is a copy:—

"PORTLAND, Oregon, June 4, 1891.

"*To the Manager Bank of British Columbia, Portland*—DEAR SIR: In consideration of advances of money already made or that may hereafter be made from time to time by your bank to the Portland Smelting and Refining Works, on overdrawn account or otherwise, we hereby severally guarantee the due repayment of all such advances, and any interest that may be due thereon at the rate of eight per cent. per annum, to the full amount set opposite our respective names hereon. This guarantee is intended as a continuing security to apply to all future as as well as any present indebtedness of the said Portland Smelting and Refining Works to the Bank of British Columbia, and to continue until revoked by notice in writing, and the balance due you paid: John Kiernan, five thousand dollars ($5,000); Chas. Hegele, five thousand dollars ($5,000); Honeyman, DeHart and Company, by E. J. De-Hart, president, five thousand dollars ($5,000); A. H. Johnson, five thousand dollars ($5,000); J. W. Cook, five thousand dollars ($5,000); W. W. Spaulding, five thousand dollars ($5,000); Kenneth A. J. McKenzie, five thousand dollars ($5,000); A. E. Borthwick, five thousand dollars ($5,000); James Lotan, five thousand dollars ($5,000); I. R. Dawson, five thousand dollars ($5,000); G. W. Staver, five thousand dollars ($5,000); H. A. Hogue, five thousand dollars ($5,000); T. Patterson, five thousand dollars, ($5,000); Edward G. Harvey, five thousand dollars ($5,000); J. Mc-Cracken, five thousand dollars ($5,000); Geo. Pope, five thousand dollars ($5,000); Julius Ordway, five thousand dollars ($5,000); F. Wolf, five thousand dollars ($5,000); J. C. Bayer, five thousand dollars ($5,000); R. B. Knapp, five thousand dollars ($5,000)." This document was placed

with the bank on the day it bears date, and continued to remain there as security against overdrafts of the smelting company until February twelfth, eighteen hundred and ninety-two, when it was withdrawn, and individual promissory notes substituted as collateral security for the repayment of such overdrafts.

As to all other points in controversy the findings of the referee as to the facts are without question in accordance with the proofs. It will suffice for a correct understanding of such facts that we set forth herein findings one to thirteen inclusive of the referee's report. "(1) That on February eighth, eighteen hundred and ninety-two, the twenty-one stockholders of the defendant, the Portland Smelting and Refining Works, whose names are subscribed to an agreement of even date, introduced into testimony as 'Exhibit A,' made and delivered to said Portland Smelting and Refining Works, hereinafter called the Smelting Works, their several promissory notes for various amounts, aggregating one hundred thousand dollars, each payable one day after date to the order of said smelting works. (2) That shortly after the time of giving of said notes twenty-one stockholders executed the agreement 'Exhibit A,' bearing even date with said notes, and by which the subscribers intended to express the agreement under which their said notes were so made and delivered, which agreement reads substantially as follows: 'This agreement made and entered into this eighth day of February, eighteen hundred and ninety-two, between the undersigned, who are stockholders in the Portland Smelting and Refining Works, witnesseth,—Whereas, in order to successfully prosecute and carry on the business of said Portland Smelting and Refining Works, it is necessary to borrow for the use of said Portland Smelting and Refining Works various sums of money, and arrangements have been made with the Bank of British Columbia, of Port-

land, Oregon, by which the said bank will loan to the said
Portland Smelting and Refining Works, upon the credit of
the undersigned stockholders, the sum of one hundred
thousand dollars, or some part thereof; and whereas un-
der the agreement entered into with said Bank of British
Columbia, said bank has a right to look to any one or
more of the undersigned for the whole or any portion of
said fund of one hundred thousand dollars, and thereby
any one or more of the undersigned may be compelled to
pay more than his or their proportion thereof; now, in
consideration of the premises, and of one dollar to each of
us in hand paid, and in consideration of the execution of
this agreement, each by the other, it is mutually agreed
between the undersigned that we will become responsible
for and indemnify and reimburse such of the grantors to
the said fund of one hundred thousand dollars, to be bor-
rowed from the Bank of British Columbia, such proportion
thereof, to the extent of our respective interests in said
Portland Smelting and Refining Works, our respective in-
terests in said fund of one hundred thousand dollars being
as follows (here are inserted the names of makers and
amount of note given by each as already set forth herein):
for which several sums we have executed and delivered to
the Portland Smelting and Refining Works our respective
promissory notes, which have been indorsed over to the
said Bank of British Columbia as security for said loan
of one hundred thousand dollars, or any part thereof.
And in the event that any one of the undersigned shall
be compelled to pay more than his due proportion of
any of the moneys so borrowed from the Bank of British
Columbia, we severally undertake to reimburse him to
the extent of our proportion as hereinbefore stated.
Said agreement was signed and sealed by the plaintiff and
by the twenty defendants to this suit other than the said
Bank of British Columbia and the said smelting works.

(3) That plaintiff was one of the twenty-one stockholders, and so gave his note for fifty-two hundred and eighty-one dollars and twenty-nine cents, dated February eighth, eighteen hundred and ninety-two, and payable one day after date, to the order of the said Portland Smelting and Refining Works. (4) That said notes were so given by said twenty-one stockholders to the said smelting company without consideration passing from said company, and with the understanding that the same were to be used by said smelting company with the said Bank of British Columbia as collateral security for such overdrafts, not to exceed one hundred thousand dollars, as the said bank might make to said smelting company, and the said notes were all so used with the said bank, and so received by the said bank. (5) That the purpose for which said loan was obtained from said bank was to prosecute and carry on the business of said smelting company, and no agreement was made as to the particular direction in which the money received thereon was to be used, nor for the length of time that the liability of the makers of said notes should continue, nor as to whether or not the same was to be used in carrying on temporary experiments or as a permanent working capital. (6) That the purpose of said agreement between the said twenty-one makers of said notes was to indemnify any one or more of them from paying more than his proportional part of any overdraft allowed by said bank to said smelting company. (7) That on July eleventh, eighteen hundred and ninety-two, plaintiff notified said bank, and also said smelting company, to make no further advances to said smelting company on account of his note, as he would no longer extend credit to said smelting company; that no consideration passed to him from said company for said note; that he demanded an adjustment as far as his note was concerned, and demanded the return thereof. Said notice to said smelting company

was addressed to its president, John McCracken, as such.
(8*a*) There is no evidence tending to show that plaintiff at
any time notified any other of the note makers than said
John McCracken that he would no longer extend his credit
to said smelting company as aforesaid.   (8) That at the
time said notices were given said smelting company had
overdrawn its account at said bank fourteen thousand
three hundred and fifty-six dollars and six cents, said over-
draft being allowed by said bank upon the credit of said
smelting company and said twenty-one notes, particularly
the latter.   (9) That after the giving of said notices, and
prior to the commencement of this suit, said smelting
company had deposited in said bank to the credit of its
said overdrawn account seventeen thousand five hundred
and thirty-four dollars and seventy-six cents.   (10) That
at no time prior to the commencement of this suit were the
payments and deposits aggregating said seventeen thou-
sand five hundred and thirty-four dollars and seventy-six
cents, or any of the same, specially applied or directed to
be applied by either said bank or said smelting company
to any particular portion of the indebtedness of said smelt-
ing company to said bank.   (11) That since said notices
were so given said bank has advanced to said smelting
works, upon its credit and upon the credit of said twenty-
one notes, large sums of money, the balance due in March
from said company to said bank being nearly sixty thou-
sand dollars.   (12) That said moneys were so advanced
upon open account, payable at the pleasure of the bank,
and said bank was under no obligation to make to said
smelting works any advances.   (13) That since the said
notes were so taken by said bank some of the makers
thereof have become financially irresponsible, and one
has died."

The conclusions of law were favorable to plaintiff, and
upon motion a decree was rendered in his favor and

against the defendant the Bank of British Columbia, but dismissing the complaint as to the other defendants, from which decree the bank appeals.          REVERSED.

Opinion by MR. JUSTICE WOLVERTON.

Plaintiff's contention, tersely stated, is that he is an accommodation maker, and as such he executed his note for fifty-two hundred and eighty-one dollars and twenty-nine cents to the Portland Smelting and Refining Works, without consideration, for the purpose of giving the smelting company credit with the Bank of British Columbia; that said note having been indorsed to the bank as collateral security for advances made and to be made to the said company upon its checks and overdrafts, he had a legal right to revoke his accommodation contract by notice to the bank and the company; that he did give notice to the bank and to the said compay July eleventh, eighteen hundred and ninety-two; that the company had then overchecked or overdrawn its account with the bank in the sum of fourteen thousand three hundred and fifty-six dollars and six cents, but that subsequently, and prior to the commencement of this suit, the company had deposited divers sums with the bank aggregating seventeen thousand five hundred and thirty-four dollars and seventy-six cents; that, notwithstanding the company had at the commencement of this suit overdrawn its account with the bank in the sum of seventy-one thousand one hundred and thirty-three dollars and sixteen cents, he was entitled to have the said deposits applied in discharge of the oldest items in the account, and that the indebtedness to the bank on July eleventh, eighteen hundred and ninety-two, was extinguished thereby, and that, therefore, having duly revoked his accommodation contract, he is entitled to have his paper returned to him.

Two questions arise here, and we will consider them in
their inverse order.  By arrangement with the bank, ad-
vances were made upon the overchecks or overdrafts of
the smelting company.  At the end of every month inter-
est was charged up by the bank at the rate of eight per
cent. upon these advances.  The items upon the debit side
of the account were numerous, extending through a period
commencing December thirty-first, eighteen hundred and
ninety-one, to March twenty-seventh, eighteen hundred
and ninety-three.  Upon the other hand, the company
from time to time had deposited with the bank divers sums
of money, which were placed to the credit of the smelting
works' account as they were deposited.  Twice during
said time balances were struck in the account, and brought
down.  These transactions between the company and the
bank constituted an open, running, or current account:
1 Morse on Banks and Banking, § 289.  Where payments
are made generally upon an open current account, and by
the creditor placed to the credit of such account in the
usual course of business, there being no special applica-
tion made of the payment either by debtor or creditor, the
rule is that the law will apply the payments to the oldest
items upon the account: *McDonald* v. *The Tom Lysle*, 48
Fed. 690; *Lazarus* v. *Friedheim* (Ark.), 11 S. W. 518; *Jones*
v. *United States*, 7 How. 687.  Mr. Justice STORY, in *United
States* v. *Kirkpatrick*, 9 Wheat. 720, says: "The general
doctrine is that the debtor has a right, if he pleases, to
make the appropriation of payments; if he omits it, the
creditor may make it; if both omit it, the law will apply
the payments according to its own notions of justice.  It
is certainly too late for either party to claim a right to
make an appropriation after the controversy has arisen,
and, *a fortiori*, at the time of the trial.  In cases like the
present, of long and running accounts, where debits and

credits are perpetually occurring, and no balances are otherwise adjusted than for the mere purpose of making rests, we are of opinion that payments ought to be applied to extinguish the debts according to the priority of time: so that the credits are to be deemed payments *pro tanto* of the debts antecedently due." To the same effect is *Steenberger* v. *Gowdy*, 93 Ky. 146, 19 S. W. 187. It seems to be the common-law rule that the law applies partial payments in matters of running accounts to those items that are the most precarious; and as the first items of the account may be first barred by the statute of limitations, the partial payments must be applied to them, in the absence of an agreement or undertaking to the contrary. See also *Field* v. *Holland*, 1 Am. Lead. Cases, 358. So that in the present case the payment of the seventeen thousand five hundred and thirty-four dollars and seventy-six cents made subsequent to July eleventh, eighteen hundred and ninety-two, would by law be applied to the extinguishment of the amount due the bank upon that date.

And now as to the second proposition. An accommodation maker of a promissory note, who has executed the same, without consideration, for the purpose of giving the payee credit with a third party, may, before the note is negotiated or comes into the hands of a third person for value, revoke his accommodation contract, and recall his paper. The validity of such paper is sustained upon the principle that where a person, for the accommodation of another, holds himself out to the world by his signature to be obligated to that other, he will not be heard to deny his obligation for want of consideration. By affixing his signature he loans his credit, to the extent of the note, for the benefit of the payee, without restriction. It is requisite, however, in order to give the paper vitality, that it be negotiated. Hence the accommodation party, before his paper has passed into the hands of a third person in

due course of business for value, may withdraw his liability and rescind his engagement: 2 Randolph on Commercial Paper, § 474; 1 Daniel on Negotiable Instruments, § 191; *Dogan* v. *Dubois*, 2 Rich. Eq. 85; *Macy* v. *Kendall*, 33 Mo. 164. This, however, does not comprehend the whole proposition upon which plaintiff's contention is based. His paper has been negotiated, and he is seeking now to relieve himself from his obligation or liability after it has been endued with vitality by passing into the hands of the bank for value and in the usual course of business. Whether he has relieved himself or not by notice to the bank and said company involves the examination of other propositions.

The note in question, with all the other notes, passed into the hands of the bank as a pledge, as collateral security for future advances to be made from time to time to the smelting company, not exceeding the sum of one hundred thousand dollars. These notes were not pledged for any definite or certain time, nor for any definite amount, so that it did not exceed one hundred thousand dollars. The bank had a mutual running account with the smelting works, which varied from day to day, according to the transactions between them; sometimes the amount due the bank would be small, at other times large. The smelting company had a continuing credit with the bank, which was based upon and supported by the note in question, together with the other notes so pledged. The bank had notice at the time that the notes were all executed solely for the accommodation of the smelting company, and for a specified purpose, that of securing the bank for future advances to the company. Could this continuing credit be terminated, and the liability of plaintiff fixed, by notice to the bank and the smelting company? If all the note makers were acting in unison in giving notice and demanding a cessation of credit, I can see no good reason why the

bank would not be bound to take cognizance of such notice and demand, and thereafter deal with the smelting company upon its own credit, assimulating the makers to that of guarantors under a continuing guaranty. Such a guaranty is revocable at any time by notice, but in so far as the guaranty has been acted upon the notice is without effect. "A promissory note pledged before maturity as collateral security for future advances, is good in the creditor's hands for all advances made before he has notice of equities between the original parties; but not for advances made after such notice, unless the creditor at the time of taking the security bound himself to make advances to a definite amount": Jones on Pledges, § 106; Brandt on Suretyship and Guaranty, § 134; *Offord* v. *Davies*, 12 C. B. (N. S.), 748; *Agawam Bank* v. *Strever*, 18 N. Y. 513. These note makers are all principals upon the face of the notes, and their engagements are several, not joint, nor joint and several; but, as between themselves, they are sureties, made so by virtue of the collateral written contract entered into by them, the material part of which is as follows: "It is mutually agreed between the undersigned that we will become responsible for and indemnify and reimburse such of the guarantors to said fund of one hundred thousand dollars, such proportion thereof, to the extent of our respective interests in said Portland Smelting and Refining Works, * * * and in the event that any one of the undersigned shall be compelled to pay more than his due proportion of any of the moneys so borrowed from the Bank of British Columbia, we severally undertake and agree to reimburse him to the extent of our proportion as herein above stated." But plaintiff, a single one of these numerous note makers, has endeavored to fix his individual liability, and to stay the credit created by his note. In considering this question the fact must not be lost sight of that this is a proceeding by plaintiff to

obtain possession of the note, and to terminate all liability thereon, which, if successful, would sever his relations with the bank, thereby relieving himself from liability in the first instance, and, while the right of the other note makers would probably remain to enforce contribution, should occasion arise under the contract, this is not the spirit of the agreement, and it would be inequitable and unjust to permit the correlative relationship and liability of the parties thereto to be thus changed or severed.   The other note makers were at least entitled to notice of plaintiff's intention to terminate his liability for further advances by the bank, so that they could, if desired, require an accounting at once, and a settlement of the whole business upon equal equities.   It follows that the notice given, and the subsequent transactions at the bank, were not sufficient to relieve plaintiff of his liability, or to entitle him to the surrender and possession of his note.

The plaintiff claims, however, that the commencement of this suit was equivalent to notice to the other note makers, and that since it is ascertained that on the twenty-sixth day of November, eighteen hundred and ninety-two, the day upon which the complaint was filed herein, there was a balance due the bank of seventy-one thousand one hundred and thirty-three dollars and sixteen cents, and that since said date and the twenty-fifth day of March, eighteen hundred and ninety-three, "the time Mr. Good gave his testimony," the smelting company deposited the sum of ninety thousand and eighty-seven dollars and sixty cents, or eighteen thousand nine hundred and fifty-four dollars and forty-four cents more than was necessary to extinguish the amount owing to the bank at the time this suit was commenced.   Were this position tenable, the amount of plaintiff's liability and the corresponding liability of the other note makers would be dependent upon the time when the testimony was rendered as to the con-

dition of the account at the bank. This might be within a few days, or it might be after a year or two, so that it would be problematical whether plaintiff had or had not a cause of suit at the time of its commencement. A party's cause of suit must be complete, and his *status* and that of the defendants fixed, at the time suit is instituted, and whether he has a cause of suit or not is measured by the relation of the parties at that time. There is a class of cases wherein it is held that the commencement of an action or suit is equivalent to a demand, but we are unable to find among the authorities any case in which it is deemed equivalent to notice. Where notice is required, it is a condition precedent to the bringing of suit, and no suit or action can be maintained without it. To hold that the bringing of a suit is equivalent to notice would be to dispense entirely with the very prerequisite thereof. The decree of the court below is reversed, and the complaint dismissed.                                      REVERSED.

MR. CHIEF JUSTICE BEAN, concurring.

The solution of the questions involved in this cause has been attended with much difficulty, and, although the conclusion arrived at was reached after careful considera-tion, I feel conscious that its correctness is not entirely free from doubt. As at present advised I concur in the result reached by Mr. Justice WOLVERTON, but on differ-ent grounds. I am inclined to think that the notice of the plaintiff to the defendant bank on July eleventh, eighteen hundred and ninety-two, fixed his liability, and his note together with the notes of all the other defendants, stood as security for the amount then due the bank from the smelting company. But I do not think that he is entitled, under the doctrine of the application of payments, to the benefit, in a court of equity, of the money paid to the

bank by the smelting company after that date, for the reason that it was the proceeds of the business of the smelting company, conducted on money advanced by the bank on the credit of the other note makers, and, therefore, should in equity and fair dealing be applied first to a repayment of the money so advanced. I am authorized to say that Mr. Justice MOORE concurs in these views.

REVERSED.

---

[Argued November 5; decided December 17, 1894; rehearing denied.]