Argued December 20, 1950; reversed January 31, former opinion reversed and judgment affirmed June 13, appellants' petition for rehearing denied October 17, 1951

# C. D. JOHNSON LUMBER CORPORATION *v.* LEONARD ET AL.

227 P. 2d 179
232 P. 2d 804
236 P. 2d 926

*W. C. Winslow* and *Roy Harland,* both of Salem, argued the cause and filed a brief for appellants.

*Frank E. Nash,* of Portland, argued the cause for respondents. With him on the brief were King, Wood, Miller & Anderson, of Portland.

Before LUSK*, Chief Justice, and ROSSMAN, HAY, LATOURETTE and TOOZE, Justices.

## LATOURETTE, J.

Plaintiff in the trial court recovered judgment against defendants in the sum of $7,737.45, this being the amount claimed owing from defendants arising out of the operation of a broom handle manufacturing business on plaintiff's premises in Toledo. The case was tried by the court without a jury. The question before us is whether plaintiff, in making the charges (the basis of the judgment), violated the Emergency Price Control Act (hereinafter referred to as E. P. C. A.) promulgated by Congress in 1942.

It is admitted in the pleadings and by the evidence that from December, 1941, until June 13, 1947, plain-

---

* Chief Justice when this case was argued.

tiff furnished defendants a lath mill and plantsite at its sawmill in Toledo, and also power, light, water and steam necessary for the operation of said lath mill and for the handle factory and dry kilns of defendants located on the site, and also fire protection and watchman services and woodstock suitable for the production of handles in defendants' said mill and factory. It is further admitted that plaintiff charged defendants, from the inception of the operation up to January, 1946, the sum of 13.3 cents per thousand feet and 8.5 cents per thousand feet on the basis of fir logs and spruce logs, respectively, that were cut in plaintiff's main mill.

The above operation was carried on under such price arrangement until the 1st day of January, 1946, when plaintiff upped its charges to 29 cents per thousand feet. Defendants paid to plaintiff currently on their account from month to month until they [defendants] terminated the contract in June, 1947, when there was a balance owing plaintiff from defendants in the sum of $7,737.45, unless E. P. C. A. forestalls its recovery.

Defendants in their answer pleaded the enactment by Congress of the Emergency Price Control Act of 1942, the establishment of the Office of Price Administration (O. P. A.) thereunder, and the issuance of a General Maximum Price Regulation by the Administrator, which was in effect beginning May 11, 1942, and ending November 10, 1946, and which regulation, among other things, recited:

"(a) No person shall sell or deliver any commodity, and no person shall sell or supply any service, at a price higher than the maximum price permitted by this General Maximum Price Regulation.

"1499.2 MAXIMUM PRICES FOR COMMODI
TIES AND SERVICES:

"General Provisions. Except as otherwise provided in this General Maximum Price Regulation,
the seller's maximum price for any commodity or
service shall be:

"(a) In those cases in which the seller dealt in the
same or similar commodities or services during March, 1942: The highest price charged
by the seller during such month—

"(1) For the same commodity or service;

\* \* \*

"'Highest Price Charged During March, 1942'
For the purpose of this General Maximum Price
Regulation, the highest price charged by a seller
'during March, 1942' shall be:

"(a) The highest price which the seller charged
for a commodity delivered or service supplied
by him during March, 1942 \* \* \*.''

Plaintiff in its reply admitted the allegations with
reference to the E. P. C. A. and O. P. A. as above set
out.

It is the contention of defendants that when plaintiff raised the price of 13.3 cents and 8.5 cents, respectively, to 29 cents in January, 1946, it violated the
O. P. A. regulations aforesaid, and, for that reason,
it cannot collect the $7,745.31 claimed by it in this case,
the amount being reflected in the increase to 29 cents
per thousand feet. Plaintiff counters that O. P. A. does
not apply. Defendants by counterclaim allege an overpayment to plaintiff, by reason of O. P. A., of the sum
of $9,537.16, and seeks its recovery.

One of defendants' assignments of error is as follows: "The Court erred in not applying the OPA
regulations to the dealings of the parties, as shown by
the record in this case."

The important question before us is whether plaintiff sold to defendants, under the arrangement between them, commodities within the purview of the E. P. C. A.

Congress, under 50 U. S. C. A. App. § 942, p. 445, defined the term "commodity" as follows:

"The term 'commodity' means commodities, articles, products, and materials (except materials furnished for publication by any press association or feature service, books, magazines, motion pictures, periodicals and newspapers, other than as waste or scrap), and it also includes services rendered otherwise than as an employee in connection with the *processing,* distribution, *storage,* installation, repair, or negotiation of purchases or sales of a commodity, or in connection with the operation of any service establishment for the servicing of a commodity * * *." (Italics ours.)

A case in point, but not cited, is *Carothers v. Bowles,* 148 F. (2d) 554, 555, 325 U. S. 875, 89 L. Ed. 1993, 65 Sup. Ct. 1556, decided by the United States Emergency Court of Appeals. The question before the court in that case was whether, in furnishing a "park and lock" type of parking, defendants were providing automobile *storage* service. It was the position of plaintiffs that they merely rented to their customers land on which the latter parked their cars, and that the operation involved did not constitute storage within the purview of the Act. The court, in dismissing this contention, said:

"By thus enlarging the ordinary meaning of the term 'commodity' to include services which relate to the creation, commercial distribution and continued use of commodities Congress has empowered the Administrator to control not only commodity prices but also the charges made for numerous services which relate to commodities. *It will*

*be observed that among the services thus included are services rendered in connection with the storage of a commodity.* This, of course, includes the storage of automobiles since they are commodities within the meaning of the Act.

"The services to which reference is made in the statutory definition are not personal services alone. They include also the services of providing equipment, machinery and tools with which to perform the particular operation and a place in which to carry it on. We think that all these are included in the concept of services as ordinarily understood in connection with the operations referred to in the definition. Accordingly within the meaning of the Act services rendered in connection with the storage of an automobile may include not only such personal service of attendants and others as may be furnished but also the service involved in providing a suitably arranged place for the storage of the automobile and the appropriate lighting and maintenance of the place so provided. All of these comprise storage service as it is commonly understood and paid for by the owners of automobiles who desire it." (Italics ours.) Certiorari denied by the United States Supreme Court.

■ The above statute defining services rendered in connection with the storage of a commodity, as a commodity, also defines services rendered in connection with the processing of a commodity, as a commodity. It thus remains to be seen whether or not the operation in the present case included services rendered in the processing of a commodity, to-wit: woodstock. Webster's dictionary defines "process" as "a method of operation or treatment, esp. in manufacture; as * * * a process of making steel." See *Bedford v. Colorado Fuel & Iron Corporation,* 102 Colo. 538, 81 P. (2d) 752; 34 Words and Phrases, Processing, 165. When

plaintiff sold to defendants woodstock, it sold a commodity; when plaintiff furnished to defendants a lath mill and power, light, water and steam necessary for the operation of the lath mill, handle factory, and dry kilns, and rendered to defendants fire protection and watchman services, it was furnishing services to defendants in connection with the processing of woodstock into handles then being manufactured by defendants.

Plaintiff does not seriously dispute that defendants were processing woodstock into handles by the use of the following language found in its brief:

> "The transaction was essentially one to enable appellants to manufacture handles. The manufacturing plant located at the source of wood by-products with spur trackage and electric power, light, water, steam, fire protection and watchman's services was what gave value to what would otherwise be a waste by-product."

Plaintiff resists the application of O. P. A. on the following grounds stated in its brief:

> "Charges made for commercial buildings, manufacturing plants and commercial real property were never subject to OPA control. The provisions of the Emergency Price Control Act were directed only to the control of prices of commodities and services and rentals from housing accommodations. T. 50, USCA, App. § 901 et seq.; Automatic Fire Alarm Co. et al v. Bowles, (U. S. Emergency Ct. App. 1944) 143 F. (2d) 602; Morrison v. Taylor et al, (CCA 5, 1944) 145 F. (2d) 466."

We agree that charges made for commercial buildings, manufacturing plants and commercial real property, *as such,* were never subject to O. P. A. control, but where the sale of commodities and services is had,

as in the case at bar, O. P. A. control definitely applies under the express provisions of the Act.

The case of *Automatic Fire Alarm Co. v. Bowles,* supra, cited by plaintiff, has no application to the question before us. In that case the plaintiffs were engaged in the business of rendering fire alarm protective service. The court said that:

"* * * Services are not commodities in the ordinary and accepted meaning of that term and they are, therefore, not within the spirit or purpose of the Act except to the extent that they are *expressly directed by the Act to be considered as commodities.* Compare State v. Standard Oil Co., 1912, 61 Or. 438, 123 P. 40, 43, Ann. Cas. 1914B, 179." (Italics ours.)

The court held that the services rendered by the plaintiff in that case were not expressly directed by the Act to be considered as commodities, and, therefore, the plaintiffs' operations did not come under O. P. A.

In the case at bar, as hereinbefore pointed out, the Act expressly provides for services rendered in the processing of commodities.

Plaintiff in its brief states the following:

"The trial court considered the evidence on the dispute as to whether, as a question of fact, the agreement between the parties was predominantly a rental of a commercial manufacturing plant with power, steam, trackage and other facilities or a sale of slab wood and edgings, and the trial court made the decision as set forth in the court's memorandum decision that:

'Without the lath mill, the trackage and their location with reference to the slab pile, the right to select the slabs would be practically worthless. It is, therefore, my belief that the principal items

for which the charge was made were the use of the lathmill and the trackage and their location in proximity to the slab pile.'

and on that basis concluded that

'* * * the transaction here involved does not come within the Act, * * *'
The conclusion and the reasons assigned for it are patently correct.'' (Plaintiff then cites *Morrison v. Taylor,* supra.)

The trial court evidently based its decision on *Morrison v. Taylor,* supra, relating to residential rentals and predicated on a different section of the law, the question being whether or not the building occupied by a tenant as a barber shop, with living quarters in connection therewith, was predominantly used for residential purposes or business purposes.

The predominance rule—if we may so term it—has no relevancy to the question before us as the law defining processing of a commodity, as a commodity, covers every step going to make up the processing and does not permit of segregation.

In the case of *Carothers v. Bowles,* supra ("park and lock" case), plaintiffs raised the same point, now advanced by plaintiff, that they were engaged in a rental proposition. From that opinion, at p. 555, we read: ''Their contention is based upon the premise that they are engaged in the rental of real estate for business purposes and not the furnishing of a service.'' The court, as hereinbefore pointed out, rejected plaintiff's contention.

■ Since plaintiff's charges against defendants of 13.3 cents and 8.5 cents, respectively, were frozen by O. P. A. as of March, 1942, the increase in charges to 29 cents was in violation of the E. P. C. A., and, for that

reason, no claim could be predicated on such increase; therefore, the judgment must be reversed.

■ Defendants' next assignment of error is that "The Court erred in not making findings in appellant's favor, as requested by appellants and not entering judgment for appellants, on their counter-claim, for $9,537.16." Defendants cannot recover on their counter-claim because they were parties to the violation of the O. P. A. regulations in payment of the overcharges and are in pari delicto. *Bowles v. Trullinger* (CCA 9, 1945), 152 F. (2d) 191; *Bowles v. Glick Bros. Lumber Co. et al.* (CCA 9, 1945), 146 F. (2d) 566.

REVERSED.

IN BANC

On rehearing.

*W. C. Winslow* and *Roy Harland,* both of Salem, for appellants.

*Frank E. Nash* (King, Wood, Miller, Anderson & Nash, of Portland, on brief) for respondents.

AFFIRMED.

LATOURETTE, J.

Plaintiff in its petition for rehearing raises the point that we erred in our former opinion in allowing to defendants "a credit or setoff against charges made after removal of O. P. A. controls." It was not until we called for supplemental briefs on the rehearing that we were enlightened on the point now made, and, upon due consideration, we hold the point well taken for the following reasons:

It will be observed that the parties entered into the contract involved in December, 1941. O. P. A. regula-

tions became effective in March, 1942, and terminated on November 10, 1946. Transactions continued between the parties until June, 1947. Plaintiff's amended complaint is predicated on a running account between the parties over the period, summing up the various charges made against defendants amounting to $46,958.15, and an aggregate payment on the account of $39,220.70, leaving a balance of $7,737.45, the amount for which plaintiff sued. The record, however, shows over the years that there were monthly charges and monthly payments made on the account, and on October 31, 1946, ten days before the end of O. P. A. regulations, the unpaid balance was $2,007.14. During November further charges aggregated $2,033.82, and on November 30, the account was reduced by payments to $2,040.96.

In our former opinion we held that both parties were *in pari delicto* because the law prohibited plaintiff from making overcharges and, likewise, prohibited defendants from paying overcharges. It is a well-recognized rule that a party to an illegal contract, made so by a prohibition of law, cannot obtain relief in law or in equity arising out of the contract. In 17 C. J. S., Contracts, 656, § 272, we read:

"No principle of law is better settled than that a party to an illegal contract cannot come into a court of law and ask to have his illegal objects carried out; nor can he set up a case in which he must necessarily disclose an illegal purpose as the groundwork of his claim. The rule is expressed in the maxims, Ex dolo malo non oritur actio, and In pari delicto potior est conditio defendentis. The law in short will not aid either party to an illegal agreement; it leaves the parties where it finds them. The general rule is the same both at law and

in equity. Likewise, the general rule is the same whether the contract is executory or executed."

Again in 12 Am. Jur., Contracts, 721, § 212, we find:

"The rule which limits the enforcement of rights growing out of illegal agreements is generally applied only in cases where the parties are in pari delicto. The rule is often expressed by saying that in cases where the parties are in pari delicto the law will leave them where it finds them."

In *Mancourt-Winters Coal Co. v. Ohio & Michigan Coal Co.*, 217 Mich. 449, 451, 454, 187 N. W. 408, the Supreme Court of Michigan in a case somewhat parallel to the one at bar held that where a seller of coal increased the price in violation of federal law, both seller and purchaser were *in pari delicto,* and that the purchaser would not be permitted to offset illegal charges against subsequent legal charges. In that case arising during the first World War, plaintiff entered into a contract with defendant to furnish defendant with coal at a certain price per ton. Later on the president of the United States promulgated an order under the Lever Act freezing the price of coal at a certain figure. Thereafter the seller raised the price of coal above the presidential fixing order, which increased price was voluntarily paid by the defendant for coal thereafter delivered. Accounts were squared between the parties up to March, 1918. Thereafter plaintiff continued to deliver coal to defendant in March and April of that year, whereupon plaintiff demanded payment for the March and April deliveries. Quoting from the opinion, we read:

"The defendant says 'no, the demand made by you for the 45 cents additional was an illegal demand and in violation of the president's order, and we will set off these illegal charges which we have

heretofore paid against the coal delivered to us in March and April.' Plaintiff was not content with this solution. It sued defendant and at the trial, after the testimony was closed, both sides requested the court for a directed verdict. After considering the matter the trial court directed a verdict for the plaintiff for the March and April coal at the contract price of $2.75 a ton. Defendant now insists in this court that the trial court's view of the law was not the proper one.''

The court further said:

''Counsel discuss the character of the account and assert that it was an open one and that defendant was entitled to recover the balance due thereon. They also discuss other questions, but we think they are not material under our view of the case. Our view is that the contract adding 45 cents a ton to the consideration made it an illegal contract. That both parties were *in pari delicto*. It is also our view that the contract was executed except as to the deliveries in March and April, and as to those the trial court properly allowed a recovery in the contract price of $2.75. The court, undoubtedly, had a right to enforce the unexecuted part of the contract in accordance with the original contract because that was a legal one.''

In a long line of decisions, beginning with *Ah Doon v. Smith,* 25 Or. 89, 34 P. 1093, we have consistently held that a party to an illegal contract, such as we have in this case, is not permitted to obtain any relief arising out of an illegal contract.

■ As defendants made payments on the accounts rendered to them by the plaintiff, they were credited on the items of the account, both legal and illegal, and to permit defendants now to offset the illegal payments against future legal charges would in effect allow them

to recover illegal payments theretofore made, contrary to all the law on the subject.

The record shows that the charges made by plaintiff against defendants after O. P. A. control ceased in November, 1946, greatly exceeded the amount now sued for, so that the claim made by plaintiff in the present action is in reality based on legal charges made against defendants.

For the above reasons, the former opinion reversing the judgment of the lower court is hereby overruled, and the judgment of the trial court is now affirmed.

In Banc

Appellants' petition for rehearing.

*W. C. Winslow* and *Roy Harland,* both of Salem, for petition.

*King, Wood, Miller, Anderson & Nash,* of Portland, contra.

Opinion filed June 13, 1951, affirmed and petition denied.

ROSSMAN, J.

A petition for a rehearing, filed by the defendants, contends:

"(1) The court is in error in affirming the judgment and not reversing the judgment and remanding the cause for a new trial.

"(2) The court is in error in disposing of the case here in this court on the record rather than on the findings.

"(3) The court is in error in its construction of the record.

"(4) The court is in error in holding that appellants are asking to offset illegal payments against a legal claim.

"(5) The court is in error in applying legal payments to the payment of illegal claims."

We think that all of those contentions can be considered together.

As mentioned in our previous opinions, the plaintiff owns a sawmill, and the defendants are engaged in the manufacture of handles, such as broom handles. A by-product, produced in the plaintiff's manufacture of lumber, which the witnesses termed refuse, consists of edgings and slab wood. As that material falls from the saws it moves upon a conveyor into the plaintiff's lath mill where, until December of 1941, the plaintiff manufactured the suitable parts into lath.

The defendants, believing that they could profitably manufacture parts of the edgings and slab wood into handles, in the latter part of 1941 entered into negotiations with the plaintiff whereby they sought (1) the privilege of taking from the conveyor whatever part of the edgings and slab wood they wished; (2) possession of the lath mill; (3) possession of a large lot adjacent to the lath mill upon which they could erect a building which would house some of their operations; (4) the use of a spur track owned by the plaintiff; and (5) the power, steam, water and other facilities essential to their operations. When the negotiations had reached a favorable juncture, the plaintiff drafted and sent to the defendants a written instrument which it proposed the parties should sign as the memorial of their agreement. For a reason which the record does not disclose, the paper was never signed by either party, but December 1, 1941, the defendants took possession of the lath mill, building site and spur track. At the same time the plaintiff began to furnish them with power, water, steam and the other facilities men-

tioned in the paper. Concurrently therewith the defendants erected upon the lot which we have mentioned a structure for housing a dry kiln and some of their machinery. In that way the course of transactions described in our previous opinions was begun.

It was not contemplated by the parties that the manufacture of lath should wholly cease when the defendants commenced their operations; to the contrary, it was agreed that the defendants should produce lath for the plaintiff in the lath mill upon request. The aforementioned writing says:

"Upon the request of Corporation [plaintiff], and for such periods as Corporation shall, or may, from time to time request, in the event Contractors [defendants] are not using the wood stock produced on the night shift, Contractors shall operate the lath mill for the production of lath. For such lath Corporation shall pay Contractors as follows:

$2.00 per thousand pieces No. 1 lath
$1.20 ″        ″          ″    ″ 2 ″

"The compensation to be paid by Corporation to Contractors for the manufacture of lath is based on the present rate of sawmill wages, namely, 75 cents per hour minimum. In the event wages are increased, the above compensation for the production of lath shall be increased by whatever percentage the rate of sawmill wages, namely, the hourly minimum, increases. * * *"

After the defendants took possession, lath was manufactured by them at the plaintiff's request from time to time, and they were credited for it upon the price scale mentioned in the words just quoted.

As is indicated by the foregoing, the defendants received from the plaintiff many facilities, such as power, water, steam, the lath mill, the building site

and the privilege of selecting from the conveyor edgings and slab wood. The aforementioned paper, in specifying the amount of compensation which the defendants should pay to the plaintiff, wittingly or unwittingly referred to all of the above as "wood stock", and then provided:

"For such wood stock Contractors [defendants] shall pay to Corporation [plaintiff] minimum compensation on the basis of 13.3 cents per thousand feet of gross deck log scale of fir logs and 8.5 cents per thousand feet of gross deck log scale of spruce logs manufactured in Corporation's sawmill during the day shift. The log scale to be used shall be the gross deck log scale as made by the Corporation's deck scaler. The foregoing minimum rate of compensation is based on the present market for No. 1 green lath, which is agreed to be $3.50 per thousand pieces No. 1 lath. In the event that the market price for No. 1 green lath shall increase to $4.50 per thousand pieces, then the minimum compensation payable by Contractors to Corporation for said wood stock shall be increased by twenty-five per cent. In the event that the market price for No. 1 green lath per thousand pieces shall increase above $4.50 per thousand pieces, then for each increase of $1.00 per thousand pieces over and above $4.50 per thousand pieces the minimum prices above specified shall be increased another twenty-five per cent."

The findings of fact include the following:

"On or about December 1, 1941, and until on or about June 14, 1947, at defendants' instance and request, plaintiff furnished defendants possession and use of plaintiff's lath mill and plant site upon plaintiff's property with spur trackage and did furnish to defendants power, light, steam, fire protection and watchman services and did permit defendants to select from plaintiff's sawmill and to

use the said wood by-products of said sawmill suitable for the production of handles and other wood products.

"In consideration therefor defendants agreed to pay plaintiff a rate of compensation based upon the market price of No. 1 green lath and computed at the minimum rate of 13.3 cents per thousand feet, gross deck log scale of fir logs, and 8.5 cents per thousand feet, gross deck log scale of spruce logs sawed at plaintiff's sawmill, subject to an increase in said rate of compensation of 25% for each increase of $1 per thousand pieces of the market price of $3.50 for No. 1 green lath."

It will be noticed that, although those findings do not declare that the unwritten contract became effective through the process of offer and acceptance, they find that the parties agreed upon a basis of compensation which was the counterpart of that mentioned in the unsigned paper. We have referred to the latter, not for the purpose of departing from the findings, but because reference to the paper aids a delineation of the course of the transactions.

Referring to the second of the quoted findings, the defendants' brief states: "We assert there is no evidence to sustain this finding." However, the same brief says: "They seem to have agreed that the basic or minimum price should be 13.3 cents per thousand feet gross deck log scale of fir logs and 8.5 cents per thousand feet gross deck log scale of spruce logs." Obviously, a "basic or minimum price" contemplates that at times the charge will be more and at other times less than the "basic or minimum price". Since it envisions fluctuations, contracts which employ basic or minimum prices set forth a formula or method for the application of the "basic or minimum price". Although by the words which we quoted from the defendants' brief, the

defendants conceded that 13.3 and 8.5 cents, respectively, were the "basic or minimum" prices for fir and spruce "wood stock", their brief contains not a word which indicates the circumstances under which the "basic or minimum price" was to be charged and those under which a different price was applicable. The absence of any word upon that subject may be significant. We believe that substantial evidence supports the attacked finding, and that the latter is entitled to the controlling effect given to the verdict of a jury. We gave it such effect in our two previous opinions, and by reviewing the matter again have not been prompted by any doubt concerning the propriety of our course; our sole purpose has been to indicate clearly the basis upon which we will proceed from this point on.

When the parties began their relationship on or about December 1, 1941, Congress had not yet enacted the Emergency Price Control Act of 1942 (50 U.S.C.A. Appendix, §§ 901 et seq.) which received attention in our first opinion. As the latter states, the regulations did not become effective until May 11, 1942, and remained in effect until November 10, 1946. The plaintiff and the defendants continued their transactions until June 14, 1947, that is, for seven months and four days after the Emergency Price Control regulations had expired. After the repeal of the act, the month-by-month charges made by the plaintiff to the defendants aggregated $17,784.02, and the sums paid by the defendants to the plaintiff totaled $12,067.91. The difference between the two amounts is $5,716.11. However, at the beginning of November, 1946, the balance of the account was $2,021.34. When that amount is added to $5,716.11 we have $7,737.45, being the amount of the attacked judgment.

Although the charges made by the plaintiff against the defendants after the termination of federal price control aggregated $17,784.02, that amount represents net charges only. Subsequent to November 10, 1946, the defendants produced lath and other items for the plaintiff for which they received credit to the extent of $2,562.85. That sum was deducted from the total charges before the latter were reduced to the net sum of $17,784.02.

We have quoted the finding of fact which states the agreement the parties effected governing the amount of the plaintiff's charges against the defendants. By reverting to the finding, it will be observed that the parties agreed that the amount of the charge should be graduated according to the market price of lath. When their agreement was effected, the market price of No. 1 lath was $3.50 per thousand pieces. However, by the time operations got under way the price had advanced to $4.50 per thousand pieces.

One of the exhibits consists of the statements which the plaintiff sent monthly to the defendants beginning with the commencement of the relationship, December 1, 1941. The statement, dated December 31, 1941, contains this entry:

"Wood stock furnished during December
Gross deck scale
    Fir      4,807,447 Ft. at 13.3¢ per M    $  639.39
Gross deck scale
    Spruce  2,313,151        8.5   ''   ''       196.62
                                              _____
                                              $  836.01
To base on Market price of $4.50 per M
    for No. 1 Green Lath add 25%                 209.00
                                              _____
                                              $1,045.01''

All of the subsequent statements were couched in similar terms and form.

The defendants made their payments, based upon the statements, to the plaintiff. Even the first statement notified the defendants that the charge made was higher than the basic charge; that is, that it was 25 per cent higher due to the fact that the market price of lath had advanced to $4.50 per thousand pieces.

The statement sent by the plaintiff to the defendants April 1, 1946, read as follows:

```
"Wood stock furnished during March
  Gross deck scale
  Fir        9,300,102 at 29.9¢ per M        $2,780.73
  Less due you:
  Lath #1    120,000 at 2.80     $336.00
       #2     48,000 at 1.68       80.64        416.64
                                             _____
                                             $2,364.09"
```

In the application of the basic or minimum price formula, the plaintiff, in 1946, began to charge for fir "wood stock" 29.9 cents, and, accordingly, the above charge for 9,300,103 feet of fir was determined at 29.9 cents per thousand feet. However, in harmony with the variable price which the unsigned paper set for lath, the defendants were given credit in the above statement at prices 80 cents and 48 cents higher for No. 1 and No. 2 lath than the basic prices of $2.00 and $1.20 specified in the sliding scale.

The above, in addition to the statements contained in our previous opinions, will suffice as a portrayal of the manner in which the parties operated after they began their relationship.

The defendants do not criticize the plaintiff's records nor the monthly statements rendered to them, with

the single exception of the price formula for "wood stock" which the plaintiff employed after January 1, 1946. The defendants concede that the entries in the monthly statements of credits and gross deck log scale were accurate. In fact, they find no fault with anything that was done, entered or charged prior to January 1, 1946. Their brief says: "The parties seemed to be pretty much in agreement until January of 1946." From the testimony given by the defendant, Charles H. Leonard, we quote:

"Q. Did you make any objection to the prices which were charged up to January, 1946?
"A. No."

Nothing occurred in 1946 with which the defendants take issue except the use by the plaintiff of the price schedule of 29.9 cents for fir "wood stock" and 19.1 cents for spruce "wood stock". Upon the issues presented at the present time they limit their criticism of the use of those prices to the period of January 1, 1946, to and including November 10, 1946. Upon the day last mentioned the Emergency Price Control regulations expired. The defendants do not contend that the price charged breached the agreement as the latter was found in the aforementioned findings of fact, but claim that it violated regulations promulgated by the administrator under the Emergency Price Control Act. According to them, the charge should have been made upon the basis which was employed when the Emergency Price Control Act became effective in 1942, that is, upon a basis of 25 per cent above $3.50.

The attacked judgment, as we have said, is in the amount of $7,737.45. We have also mentioned the fact that the parties continued their operations for seven months and four days after the Emergency Price Con-

trol regulations had expired. The attacked judgment represents a balance which was owing June 14, 1947, when the relationship between the parties ended. If the balance of $7,737.45 arose out of transactions which were consummated after the regulations have expired, it is evident that the repealed regulations have no bearing upon the issues before us. We have mentioned the fact that after the repeal of the regulations the plaintiff made charges against the defendants which totaled $17,784.02. By adding to that total $2,562.85, which represents credits to the defendants for goods produced by them for the plaintiff, we have gross charges against the defendants in the total amount of $20,346.87. We have also mentioned the fact that after the repeal of the Emergency Price Control regulations the defendants paid the plaintiff sums totaling $12,067.91.

The balance of the defendants' account November 1, 1946, was $2,021.34. If it remained unpaid November 11, 1946, then that much of the charges made in the Emergency Price Control period was carried over into the period unaffected by the regulations. During the month of November, 1946, the plaintiff made charges against the defendants totaling $2,115.66 and gave them credit for items produced by them in the amount of $81.84. The net charge made against them was, therefore, $2,033.82. Since the federal regulations were in effect for only one-third of that month, it may be that only one-third of the charge arose in the period when the act was in effect. But we have no evidence upon that phase of the matter. By adding $2,033.82 to $2,021.34 (balance as of November 1, 1946), we have $4,055.16, which, presumably, represents the gross amount of the charges in issue which were made in the period when the price control regulations were in ef-

fect. However, as we have noticed, the defendants paid the plaintiff, after the expiration of the regulations, $12,067.91. The payments were made by eight checks which were sent to the plaintiff at different times. The largest was in the amount of $5,000 and the smallest in the sum of $9.21. The payments were made after the defendants had received statements of the kind which we have quoted and were made in the same manner as all other payments had been made since the inception of the relationship in December, 1941. The defendant, Charles H. Leonard, who was the sole witness to appear for the defendants, swore that he knew that the plaintiff's charges violated regulations promulgated under the Emergency Price Control Act. The defendants make no claim that any of the eight payments were accompanied with directions given by them for the application of the payment. Likewise, there is no contention that after the plaintiff had appropriated the payment the defendants were ignorant of the application or protested that the payment should have been applied in some other manner. Mr. Leonard, as a witness, neither by direct statement nor even by intimation, indicated that the defendants found any fault with the application which the plaintiff had made of any payment. The record shows that the plaintiff appropriated all payments received in the same manner, that is, upon open account. To make matters entirely clear, we add that when the plaintiff began to receive payments for the period beginning January 1, 1946, when a material increase in the charges was made for the "wood stock", the payments were applied in the same manner as all payments which had been received since December 1, 1941, that is, upon open account.

Before pursuing further the matter of application of payment, we notice that the complaint avers in dual

form the cause of action: the first count is predicated upon an averment that the parties had an agreement which governed the compensation which the plaintiff should receive for the facilities which it delivered to the defendants; the second count is based upon quantum meruit. The answer, after first making admissions and denials, set forth affirmatively that the charges made by the plaintiff after the promulgations of the federal Emergency Price Control regulations were illegal and that the defendants had paid all lawful charges. The reply to the affirmative answer, after averring in separate amounts the charges and payments made in segregated periods beginning with December 1, 1941, and ending December 31, 1945, alleged:

"That since December 31, 1945, and in addition to the payment by defendants of $1,969.30 on January 24, 1946, defendants have voluntarily paid the plaintiff, in response to plaintiff's statements of accounts and demands for payment, the sum of $23,988.91 and said accounts between plaintiffs and defendants to and including November 10, 1946, have been paid and settled."

Continuing, the reply set forth facts and figures intended to show that the balance of $7,737.45, for which judgment was sought, arose exclusively out of transactions which occurred after November 10, 1946. In that manner the issue of the application of payments was submitted.

The following is a detailed statement of the debits and credits beginning with November, 1946, and continuing through to the close of the parties' relationship:

| 1946 | "Charges | Cash Payments |
|------|----------|---------------|
| Nov. 15 | | $ 14.20 |
| 30 | $ 2,033.82 | |
| 30 | | 2,000.00 |

| 1946 | | "Charges | Cash Payments |
|---|---|---|---|
| Dec. | 19 | 11.70 | |
| | 30 | 1,385.92 | |
| 1947 | | | |
| Jany. | 6 | | 1,500.00 |
| | 31 | 2,926.53 | |
| | 22 | 33.40 | |
| Feby. | 28 | 3,261.94 | |
| Mar. | 5 | | 1,500.00 |
| | 27 | | 5,000.00 |
| | 27 | 2.80 | |
| | 31 | 4,940.30 | |
| Apr. | 30 | 1,380.82 | |
| | 30 | 8.80 | |
| May | 6 | 3.50 | |
| | 14 | 42.61 | |
| | 19 | | 9.21 |
| | 29 | | 2,000.00 |
| | 31 | | 44.50 |
| | 31 | 1,109.91 | |
| June | 14 | 592.51 | |
| | 30 | 49.46 | |
| | | $17,784.02 | $ 12,067.91" |

In their petition for a rehearing, the defendants say:

"Respondents [plaintiff] are now attempting to apply perfectly valid payments, to-wit: the payment made on November 30 against an invalid claim, to-wit: against a claim that had accrued before November 10.

"* * * *

"We assert here that it is wholly impossible to make any segregation at all as of the date O.P.A. was lifted and if the court is going to say that any wood stock furnished after that constituted a legal claim, by the same token the court must say that any payment made afterwards is a legal payment. Therefore, the $2000 paid by us on November 30

should be applied on a legal claim; a claim accruing after November 10, and not on items accruing prior to that time which are illegal claims."

The only possible items which could have been pending for payment November 30, 1946, when the defendants made their remittance of $2,000, mentioned in the quoted language, were (1) the balance of $2,021.34, which was carried over from October, and (2) the November net charges totaling $2,033.82. The November statement was dated November 30, 1946, and, unless it was received by the defendants before they delivered their check to the plaintiff on the same day, there was pending for payment only the October balance. Since the federal price regulations expired November 10, it is likely that at least a part of the November charge of $2,033.82 arose in the price-regulated period. But, as we have seen from the language just quoted, the defendants say that "it is wholly impossible to make any segregation at all as of the date O.P.A. was lifted". Therefore, both the balance of $2,021.34 and the new charge of $2,033.82 were, according to the defendants, illegal charges. Accordingly, when they handed to the plaintiff on November 30 their check for $2,000, there was no "legal claim" (we took that term from defendants' above-quoted language) upon which the remittance could have been applied.

Before considering the legal principles which govern the application of a payment received by a creditor, we shall summarize as follows the facts developed by the foregoing narrative: (1) On November 30, 1946, when the defendants paid the plaintiff $2,000, the plaintiff had no "legal claim" against the defendants (assuming that the Emergency Price Control Act governed the transactions); (2) the $2,000 was remitted by the defendants to the plaintiff in the same manner as

all other remittances had been made; that is, without direction as to application; (3) the plaintiff appropriated the $2,000 payment in the same manner as it had all previous payments, that is, upon the running account; (4) the defendants presumably knew of the manner in which all previous payments had been applied; (5) the defendants made no objection or protest concerning the application of the November payment; and (6) the defendant, Charles H. Leonard, sole witness for the defendants, did not claim that the defendants took any exception whatever to the application of the November payment.

■ We think that an inference is warranted that when a debtor makes a monthly remittance in the same manner as he has made similar remittances for more than five years, and knows that his creditor has regularly appropriated the monthly payments to the running open account, he intends that the current payment shall be applied in the same way as the previous ones. Especially do we believe that the inference is warranted when the debtor has never objected to the applications. His silence must be deemed acquiescence.

We take the following from Corbin on Contracts, § 1231:

"A debtor has power to determine the application of any money payment that he tenders to his creditor, except when he holds the money as a trustee or under a duty to apply it in a particular way and the creditor knows or has reason to know that he so holds it. Aside from such a duty, a debtor can tender a payment on his own terms and the creditor must receive it on those terms or not at all. If the debtor owes more than one debt to his creditor, matured or immatured, he can direct that any payment tendered by him shall be applied to any one of

the debts, or to none of them, or to more than one of them in any specified proportion. To attain his end, all that is required is that he shall cause the creditor to be aware of his directions at the time the money is tendered."

From 40 Am. Jur., Payment, § 112, page 793, we quote:

"A debtor may direct a payment to be applied to any debt or item of indebtedness as may be most advantageous to him, or he may apply it all to one debt, and need not apportion it pro rata among them. When one of the debts or items of an account is illegal and the others valid, the debtor may, at his option, apply a payment to either. In such a case, an appropriation upon the illegal claim is as valid and binding on the debtor as if it were legal, and he cannot subsequently, without the creditor's consent, change it and have it applied to the legal demand."

According to 70 C.J.S., Payment, § 61, page 266:

"The creditor may appropriate a payment, however, to an illegal claim with the debtor's consent either express or implied, and consent may be implied from the course of dealing between the creditor and debtor, * * * ."

Restatement of the Law, Contracts, § 387, develops in the following language the principle with which we are concerned:

"Where more than one matured contractual duty is owed to the same person and these duties are for performances of identical character, such as the payment of money, a payment or other performance capable of discharging in whole or in part either one or another of these duties, is applied, subject to the rules stated in §§ 388-393,

"(a) as the debtor, at or before the time of payment or performance, manifests to the creditor an intention to have it applied; * * * ."

From the Comment which follows that statement, we take this:

"d. * * * The debtor may direct the application to the principal of a debt, though interest is overdue; and to a particular debt though the application is in violation of a contract previously made by him that the money shall be otherwise applied. He may direct the application of the payment to an unenforceable or even to an illegal claim, for since a man is free to give money or anything else without any consideration to anyone who is willing to accept it, a payment may be made in satisfaction of a supposed claim, invalid for illegality, or for any other reason, as well as in satisfaction of a valid claim. * * *

"e. It is not essential that the debtor's intent shall be manifested in express words. Here, as elsewhere in the law of contracts, a manifestation of intent deduced from acts or from the circumstances of the case is as effective as if expressed in words; * * * ."

The following illustration accompanies § 387:

"6. A owes B $100 and is also subject to a claim of B for $100 for losses at cards. Claims for gambling losses are illegal. A pays B $100 directing that the money shall be applied to the discharge of the claim for losses at cards. The other debt is not discharged by the payment."

Restatement of the Law, Contracts, § 392, says:

"An application of a payment once rightfully made by one party, cannot thereafter be changed without the manifested assent of the other. * * *"

■ This court has held that one who owes more than one debt to a creditor may, upon making a payment to him, direct the application of the payment: *Fatland v. Wentworth & Irwin, Inc.,* 149 Or. 277, 40 P. 2d 68, 97 A.L.R. 339, and *Anderson v. Griffith,* 51 Or. 116, 93 P. 934. If the debtor gives no directions, the creditor

may apply the payment to any account which he selects, provided the account upon which he applies it is a lawful demand: *Fatland v. Wentworth & Irwin, Inc.,* supra, and *Anderson v. Griffith,* supra.

In *Phillips v. Moses,* 65 Me. 70, the defendant, a retail druggist, made purchases, including some illegal items, from the plaintiffs, wholesale druggists, on an open account in a period which extended from 1868 to September 13, 1873. The action was instituted to recover an alleged balance of $3,481.68. The total purchases, $21,711.28, included spirituous liquors for which $6,842.26 was charged. The liquor transactions were in violation of law. The payments made from time to time were unaccompanied with any designation as to the item to which the payment should be applied and were appropriated to the entire account. The defendant testified that he intended that the payment should be applied to the legal part of the account. In ordering a new trial after the jury had returned a verdict for the defendant, the court, after holding that a purchaser who makes payment for illegal goods has no right to recover the purchase money, said:

> "It is clear, therefore, that he cannot make such payments in any manner available as an offset against a demand for goods lawfully sold; nor when once appropriated with his consent to such illegal items, can he withdraw that consent against the will of his creditor, and claim to have them reckoned as payment for legal purchases."

Continuing, the court held that a debtor has a right to control the application of any payment which he makes " * * * even though he sees fit to appropriate it to a claim arising in violation of law. * * *

"The debtor's consent, once given, cannot be recalled except by mutual agreement. It is not nec-

essary that such consent should be embodied in any set form of words. It, may be inferred from acts, circumstances, course of dealing, knowledge of such appropriation by the creditor and tacit consent thereto, as well as by words evincive of an intention to make such appropriation, or of assent to such appropriation already made by the creditor. * * *

"Without rehearsing the facts proved and admitted, or the testimony given, to any extent, it is sufficient to say that in view of the length of time during which these transactions continued, the course of dealing between the parties, the great number of sales, and the frequency, mode and amount of the defendant's payments, and his own statements upon cross-examination, that he never paid at any particular time more than he thought was due, (though his payments were greatly in excess of the legal items,) * * * it must be said that the undisputed facts and his own avowals overpower his assertion that he intended to appropriate his payments to the legal part of the accounts so completely, as to lead us to the conclusion that the jury either misapprehended the testimony or the instructions, or were governed by some bias or prejudice which misled them as to the force and effect of the testimony in the case."

We take the following from *Richardson v. Woodbury,* 66 Mass. 279:

"This was an action of assumpsit on an account, for sundry articles of merchandise, many of which are intoxicating liquors, sold without license and contrary to law, for which no action will lie. The defendant had made cash payments from time to time, taking receipts on account. By an agreement made between the parties, at the commencement of the account, it was stipulated that all moneys paid, should be applied in the first instance to sums due for liquor. If the payments are all applied conformably to this agreement, the liquors are all paid

for, and to the residue of the account, there is no objection.''·

The decision, written by Chief Justice Shaw, declared:

"The opinion of the court is, that the plaintiffs had a right to apply their payments according to the agreement, to the items for liquor. On each payment being made under such agreement, the application was made by force of the agreement, and the agreement ceased to be executory. An executory agreement to perform acts contrary to law cannot be enforced; but when in fact executed, there is no occasion to resort to the law to enforce it, and it is then too late for the purchaser to avail himself of the illegality.''

In *Treadwell v. Moore,* 34 Me. 112, the court said:

" * * * The debtor has, in the first instance, the right to apply the payments in reduction of any claim whatsoever. The claim may be one which the law will not enforce, it may be in violation of its provisions, and the party paying may have the right to recover it back, still the money must be applied by the party receiving it, as the debtor when making the payment shall direct.''

We are in accord with the views expressed in the authorities from which we quoted. We believe that a debtor has a right to require that a payment which he makes shall be applied upon an illegal claim. We also believe that when the application has been made in obedience to his wishes, he cannot change the appropriation without the creditor's consent.

Without further analysis of the evidence, we express the conviction that it unequivocally requires a conclusion that the defendants desired to have their payments applied in the exact manner in which the plaintiff applied all of them; that is, upon the open account.

It is true that the findings of fact contain no finding

upon the foregoing; however, none was requested, and those which were entered support the attacked judgment.

From the above it will be seen that the balance of the account for which judgment was rendered was based wholly upon transactions which occurred after the Emergency Price Control regulations had expired. To render certain our meaning, we call attention to the fact that after the expiration of the Emergency Price Control regulations the defendants paid to the plaintiff $12,067.91, and that the greatest possible amount of "illegal claims" that remained unpaid after the termination of the act was $4,055.16. When the latter sum is deducted from $12,067.91 we have $8,012.75, an amount materially larger than the attacked judgment, $7,737.45.

We express our belief that the Emergency Price Control Act had no application whatever to any transaction which constitutes a part of the balance. Hence, no item represented in the balance was an illegal item (assuming that the act, while it was in effect, governed the relationship between the parties).

To avoid misinterpretation of our position, we add that since the balance for which judgment was rendered by the Circuit Court was based upon transactions which occurred after the Emergency Price Control regulations had expired, the cause called for no determination as to the legality of the transactions between the parties in "wood stock", and, accordingly, we express none.

In reaching the foregoing conclusions, we have not embraced "a theory different from that on which it was tried." We took the quoted words from the brief which accompanies defendants' petition for a rehearing. After the case had been submitted to the trial

judge, and while he had it under advisement, plaintiff's counsel filed with him a brief which contained this statement:

"The balance due from the defendants to the plaintiff is the sum of $7,737.45, and the entire balance due represents charges incurred and becoming due after the OPA controls were removed. The accounts between the parties show that the defendants have made periodic payments on past due accounts and that the last such payment was made in May, 1947, and that all past due accounts have been paid by the defendants except the accounts for March, April, May and the first half of June, 1947. All payments by defendants have been made in response to monthly statements of account furnished by the plaintiff, which accounts were accepted by the defendants and the defendants have made payments thereon voluntarily and in response to plaintiff's demand of right."

We found that brief in the judgment roll. The latter also contains an answering brief submitted by defendants' counsel (not the present one), but it left unmentioned the assertions contained in the quoted passage. Accordingly, even when the cause was pending in the trial court, the plaintiff urged the point of view which influenced our second opinion and which is developed in this one.

Before writing this opinion we restudied the entire case. We once more read the briefs and the evidence which was given during the trial. All contentions advanced by the parties in their original briefs, as well as in the two petitions for rehearing, have been carefully analyzed again and all of the authorities cited by the parties have been consulted. Our second opinion is affirmed and the defendants' (appellants') petition for a rehearing is denied.