[Civil No. 3353. Filed March 25, 1935.]

[42 Pac. (2d) 409.]

THE IMPORTERS' & EXPORTERS' INSURANCE COMPANY OF NEW YORK, a Corporation, Appellant, v. FIDELITY AND DEPOSIT COMPANY OF MARYLAND, a Corporation, Appellee.

Mr. Samuel White, for Appellant.

Messrs. Silverthorne and Van Spanckeren, for Appellee.

McALISTER, J.—The Importers' & Exporters' Insurance Company of New York brought an action

against Charles E. MacMillin and the Fidelity & Deposit Company of Maryland to recover the sum of $8,076.46, which it alleges MacMillin caused it to lose and against which it had been indemnified by a bond of the latter. The plaintiff was awarded judgment against MacMillin for $5,550.41, but was unsuccessful against the surety and it is the judgment in favor of the latter that the plaintiff is asking this court to review.

The facts out of which the action grows are substantially these: In October, 1927, the plaintiff employed Charles E. MacMillin as its State Agent for Arizona, his duties being described in the written contract of employment as follows: To act as plaintiff's representative in Arizona in supervising the business of fire and automobile insurance; to appoint local and sub-agents subject to the approval of plaintiff and to terminate such appointments when necessary; to bind insurance and reinsurances to the extent the employer prescribed; to collect agency balances and assume full liability for the payment of same; to transmit daily reports of policies written and monthly accounts of the business done, the latter to be forwarded in such way that they would reach the home office not later than the tenth of the following month; and to pay the balances thereunder not later than ninety days after the end of the month for which the account was rendered. For these services the company agreed to pay MacMillin a salary of $7,000 a year and in addition an amount equal to 5 per cent. of its net yearly profits in Arizona.

The plaintiff required MacMillin to indemnify it against loss resulting from certain acts and by way of compliance therewith the Fidelity & Deposit Company of Maryland made and delivered to the plaintiff on November 22, 1927, its bond in the sum of $15,-000 and agreed therein to pay plaintiff within sixty

days after proof thereof the amount of any loss Mac-Millin might cause it to sustain "through larceny, theft, embezzlement, forgery, misappropriation, wrongful abstraction, willful misapplication or any other act of fraud or dishonesty committed" by him during the year beginning November 1, 1927, and by a continuation certificate this bond was extended for a second year beginning November 1, 1928. It provided, among other things, that it should "terminate as to future acts of any Employe immediately upon discovery by the Employer, or, if a corporation, by an officer thereof not in collusion with such Employe, of any fraudulent or dishonest act on the part of such Employe," that the "Employer shall notify the Surety by letter or telegram addressed and sent to it at its home office in the City of Baltimore, Maryland, of any defaults hereunder or of any other fraudulent or dishonest act on the part of any Employe, within a reasonable time after discovery thereof by the Employer, or if a corporation, by any officer thereof not in collusion with such Employe," and that "the Surety shall not be liable hereunder, directly or indirectly, . . . on account of premiums not actually collected by the Employe."

MacMillin entered the service of plaintiff as its State Agent in October, 1927, and continued therein until September 20, 1929, when he received from the plaintiff a letter dated September 16, 1929, discontinuing his agency and giving formal notice of the immediate cancellation of the contract. Two reasons were assigned therein for this action, the first being that MacMillin had accepted the general agency for another company, and the second, that he had failed to cooperate with the underwriting department of the plaintiff in that he had written prohibited risks freely and ignored requests for cancellation of policies. The deposition of the vice-president of the

company stated, however, that the one reason for the cancellation was "MacMillin's failure to account for moneys due us."

The evidence discloses that on February 6, 1930, the plaintiff filed with the defendant company proof of loss and a detailed statement of its claim therefor under the bond of MacMillin, showing that MacMillin owed it $8,076.46 in premiums collected by him on insurance policies issued by it in the state of Arizona through his agency during the months of July, August and September, 1929. The full liability for these months as shown by the claim was $12,943.25 but credits thereon during October, November and December of that year of $2,366.79 on account of premiums returned and $2,500 in cash paid by MacMillin on December 17th, had reduced this to the amount claimed, $8,076.46. The defendant company denied liability in any sum whatever, so on August 6, 1930, the plaintiff brought suit against it and MacMillin for this sum, but the amount was reduced before the trial to $5,550.41 by credits of $526.06 for return premiums for the period January 1st to May 31, 1930, and of $2,000 for cash paid by MacMillin after the commencement of the action but before the hearing in November, 1932. The plaintiff recovered judgment against MacMillin for $5,550.41 and this appeal is based on the contention that this sum was covered by the bond and that judgment for it should have gone against the surety also.

It appears that, notwithstanding the discontinuance of his agency on September 20, 1929, pursuant to a provision of the contract of employment giving either party the right to terminate it at any time, MacMillin continued to collect premiums on policies written prior to that date, and that these funds formed a part of the amount for which the judgment against him was rendered. The bond indemnified

appellant against acts of MacMillin as its employee and the appellee took the position below, and urges here, that it did not cover funds which MacMillin collected after the cancellation of his agency on September 20, 1929, and failed to turn over to it. The trial court upheld this contention and its action in so doing is made the basis of one of the principal assignments. Appellant contends that the termination of the contract applied only to writing new policies and did not interfere with MacMillin's right to collect premiums on those already written. Its position is that since the contract gave him ninety days from the end of the month for which the account was rendered to pay the balances shown thereby, the appellant could not take from him authority to collect these amounts during this period and, this being true, the bond necessarily covered moneys which went into his possession that way. This view, if true, means that the contract was not canceled in its entirety or the agency discontinued for all purposes, but that it was terminated in part and continued in part.

The letter to MacMillin states, among other things:

"We regret to be obliged to notify you of our decision to discontinue your agency. . . . We hereby give formal notice of the immediate cancellation of The Importers and Exporters and Mohawk Fire contracts, both fire and automobile. Kindly note that you forthwith cease to represent us as State Agent, and your authority to act on our behalf is terminated. . . . In order to facilitate matters we have arranged with Messrs. Swett and Crawford of San Francisco to act as our representatives in closing the agency."

It contains other expressions along the same line but these are sufficient to make it plain that appellant's purpose was to cancel the contract in all respects and deprive MacMillin of any right whatever to act under it. This view is greatly strengthened,

in fact, made certain, by the testimony of appellant's vice-president that the one reason for canceling Mac-Millin's agency was his "failure to account for moneys due us." This statement leads one to the conclusion that it was not the purpose of appellant to continue a situation that enabled MacMillin to keep up the line of conduct that brought about the discontinuance of his agency. After claiming that he was discharged for failing to turn over premiums collected, appellant was hardly in a position to urge that, notwithstanding his shortcoming in this respect, it kept the contract intact for ninety days from the close of September, 1929, in so far as it pertained to his authority to make these collections. The contention that cancellation did not affect the contract in this particular is without merit.

Either party had the right under the agreement itself to terminate it at any time and if appellant, after canceling it by virtue of this authority, permitted MacMillin to continue to make collections, it could not successfully contend that the funds that went into his hands pursuant thereto were protected by the bond. Such collections were either authorized by an agreement subsequent to September 20th, or made in disregard of the fact that his contract had been terminated, and in neither instance could it be said that his acts were covered by the bond. If, after canceling the contract, appellant, instead of taking charge of the business itself, allowed Mac-Millin to collect premiums for ninety days and suffered additional losses as a result thereof, it cannot look for protection to the bond which applied only to his acts as an employee.

However, in its pleadings and proof appellant proceeded upon the theory that the cancellation of the contract did not affect MacMillin's right to collect premiums on policies already written and, hence, that

appellee was liable on his bond for any shortage occurring after July 1, 1929, to the same extent that MacMillin was, whether it happened before or after the termination of the agreement.  To show how much his shortage was appellant introduced its records of MacMillin's business, the same being copies of reports made to it each month by him, and they disclosed that there had been written through his agency after July 1, 1929, $19,680.15 in gross premiums, that the commissions thereon were $4,319.94 and that this left a balance of $15,360.21 in net premiums due appellant by MacMillin.  The records showed further that MacMillin had been credited on this balance with $5,309.80 in return premiums and $4,500 in cash which reduced his indebtedness to the amount claimed by appellant and awarded by the court against him, $5,550.41.   This would have been proper as against appellee also if the bond had covered collections made after the termination of the contract and had guaranteed the indebtedness of MacMillin for premiums written, whether he collected them or not.   However, it did not do either but provided specifically that "the Surety shall not be liable hereunder, directly or indirectly, on account of . . . premiums not actually collected by the Employe." Such being the character of appellee's undertaking it is clear that the amount of the gross premiums, commissions, net premiums and return premiums were immaterial as to it except in so far as they may aid in ascertaining the two controlling facts, first, how much cash did MacMillin collect prior to September 20, 1929, and, second, did he properly account for it?

The first of these questions is easily answered because the evidence discloses that MacMillin collected in cash on these premiums during the period, July 1, 1929, to May 31, 1930, the sum of $7,550.41 and that

of this. $4,168.90 was collected before and $3,381.51 after the contract was canceled on September 20, 1929. The only portion of it, therefore, that is covered by the bond and calls for consideration is the $4,168.90 which, if it has not been paid either to the appellant or to someone else on its account, represents the amount for which the surety is liable. According to the testimony, MacMillin sent appellant in December, 1929, $2,500 in cash on his July account and this sum when applied on the $4,168.90 leaves a bond liability of $1,668.90. The court was justified in crediting this payment on the total cash collected prior to September 20, 1929, because there was no segregation of the $4,168.90 according to the month collected and, therefore, nothing to advise it whether the collections in July were less, equal to, or greater than $2,500. If they were less, in which event the difference between them and $2,500 should perhaps have been applied on the sum due by MacMillin on uncollected premiums for that month, appellant should have brought facts showing this to the attention of the court, but the only evidence it had before it on the subject was that the total cash collections during July, August and the first twenty days of September amounted to $4,168.90.

█ █  The evidence further discloses that in 1931 MacMillin paid on his indebtedness of $7,550.41 for the period, July 1, 1929, to May 31, 1930, $2,000 (in installments of $200 and $500 each) and that he did not direct that it be applied upon any particular portion of this account. In a situation of this kind the rule of law applicable is that the payment be appropriated to the oldest debt, that is, "the debt first becoming due." 48 C. J. 656, par. 110. "In the absence of an agreement or instruction to the contrary payments should be applied to the extinguishment of those items or claims which are earliest in point of

time. . . . " 21 R. C. L. 103. Following this rule and applying the $2,000 on the portion of the debt that first became due, that is, the cash collected in July, August and the first twenty days of September, 1929, it completely satisfies the remaining $1,668.90 of the $4,168.90 and relieves the surety of any liability whatever.

It is undoubtedly true also that a portion of the more than $5,000 in return premiums with which MacMillin was credited prior to September 20, 1929, was cash returned by him to policy-holders upon the cancellation of the unused portion of their policies, but these were not segregated from those that represented mere book transactions and could not, therefore, be credited to him on his cash collections of $4,168.90.

The judgment of the lower court is affirmed.

LOCKWOOD, C. J., and ROSS, J., concur.