Argued May 19, reversed and remanded September 15, petition for
rehearing denied November 3, 1954

# FOWLER *v.* COURTEMANCHE ET AL.

274 P. 2d 258

416

*C. X. Bollenback* and *Elton Watkins,* of Portland, argued the cause and filed a brief for plaintiff-appellant.

*Hugh L. Biggs,* of Portland, argued the cause for defendants-respondents and cross-appellants. On the brief were Cleveland C. Cory, and Hart, Spencer, Mc-Culloch, Rockwood and Davies, all of Portland.

Before WARNER, Acting Chief Justice, and LUSK, BRAND and PERRY, Justices.

## BRAND, J.

This is an action at law for compensatory and punitive damages on account of the alleged wrongful and malicious conversion of a number of logging trucks and trailers and certain other logging equipment. The plaintiff is Irwin W. Fowler. The defendants named in the complaint were L. A. Courtemanche, an individual, L. A. Courtemanche, a corporation, Automotive Equipment Company, a corporation, and The Courtemanche Acceptance Corporation. The case against L. A. Courtemanche, an individual, was dismissed. There was a verdict for plaintiff in the sum of $9,240.69 as general damages and $35,000 as punitive damages against the three corporations and judgment was entered on the verdict. Thereafter the defendants moved for judgment notwithstanding the verdict and in the alternative for an order setting aside the judgment and entering one in favor of plaintiff for the amount of the compensatory damages only. In event the foregoing motions should be denied, defendants moved for a new trial. The court found that the defendants' motion for a directed verdict, made at the trial, should have been granted and that the motion for judgment n.o.v. should be allowed. Judgment to that effect was entered. The court also found that the alternative motion to eliminate the verdict for punitive damages was well-taken and would have been allowed if it had

not granted the motion for judgment n.o.v. The plaintiff appeals.

We shall refer to the three corporations collectively as "the defendants." L. A. Courtemanche, a corporation, will be referred to as "Courtemanche"; Automotive Equipment Company as "Automotive"; and The Courtemanche Acceptance Corporation as the "Acceptance Corporation".

We deem it unnecessary to review the pleadings at this time. The defendants-respondents very properly state in their brief that "Appellant's statement of the case and the facts is substantially accurate." We turn to the facts thus stated.

Early in 1950 the plaintiff negotiated for the purchase of certain personal property which is described, together with other property, in the complaint. It appears that some of the property belonged to Courtemanche and some to Automotive, but the rights between these two defendants were adjusted among themselves. The property was purchased by plaintiff from Courtemanche and plaintiff executed a note and chattel mortgage to Courtemanche for the full purchase price which was stated to be $102,177.78. In order to give to the mortgagee additional security the plaintiff included in the mortgage certain personal property owned by him in addition to that purchased from Courtemanche, which additional property was of the reasonable market value of $24,000, according to the testimony in behalf of plaintiff. Particularly included was a 1947 Peerless trailer, the property of plaintiff. The note provided for 10 per cent interest per annum and the mortgage provided for payments in instalments of $5,700 monthly, beginning on 25 May 1950 until principal and interest were paid. The sum of $102,177.78 which is recited in the mortgage as the

amount owing included substantial financing charges and prepaid interest until maturity. Courtemanche, the mortgagee, assigned the note and mortgage to the Acceptance Corporation, which pledged both to a bank, taking a loan thereon sufficient to cover its payment to Courtmanche. The amount which became due and owing between the execution of the mortgage and the alleged conversion of the property on 6 October 1950 was $28,500. The payments which were made by the plaintiff prior to 6 October 1950 amounted to $26,667.87. It follows that on the latter date plaintiff was in default unless he was entitled to a further credit sufficient to cover the apparent default of $1,832.13. The plaintiff contends that he was entitled to such an additional credit and the defendants in their brief say:

"* * * the decisive question was whether or not appellant on that date was in default under the terms of the note and chattel mortgage given to secure the total purchase price of all the equipment and accessories.

"While respondents' amended answer set up three separate grounds of default, and appellant's second amended reply to these defenses was based on three separate theories, both parties agree that only one of the grounds of default is material to appellant's appeal from the judgment notwithstanding the verdict.

"This ground of default was that on or prior to October 6, 1950, appellant had failed to make the payments due as provided by the said note and mortgage. * * *"

The facts on which the plaintiff relies as proof that he was not in default on the date of the seizure relate to a certain Peerless trailer which was owned by the plaintiff and included in the mortgage to Courtemanche as additional security along with the property purchased by the plaintiff. The trailer was unsuitable for

the operations in which plaintiff was engaged and it was agreed by the mortgagor and the mortgagee that the trailer might be sold.

During the latter part of April or early in May, the plaintiff left the trailer with the Pierce Trailer Company with instructions to sell it for not less than $2,500, and it was sold some time in June according to the testimony of Louis Courtemanche. Some time later the plaintiff inquired of Mr. Louis Courtemanche, who was vice president of all three of the defendant corporations, as to what disposition had been made of the trailer. We quote the plaintiff's testimony:

"A. Later I was talking to him in Portland, and I was in his office, and I asked him, I says, 'What become of that trailer?' It was quite a while after that I had taken it up to Pierce Trailer. And he says, 'Pierce sold it,' and I says—and Mr. Hansen spoke up, and he says, 'We had to give Pierce $250 commission for selling it.' And I said—I asked Mr. Courtemanche what he done with the $2250 that was left then, and he said, 'Well, you'll get credit for that in time.'

"Q. Did he say on what account you would get credit for it?

"A. Pardon?

"Q. Did he say on what account you would get credit for it?

"A. No, no, no. He just said, 'You'll get credit for it in time.' "

The Acceptance Corporation was the only one of the defendants which had any right to deal with the property covered by the mortgage or to authorize its sale. The Acceptance Corporation received the proceeds of the sale in the sum of $2,500. According to the testimony of plaintiff, Mr. Hansen who was vice president and manager of Automotive stated that they had to pay

a commission of $250 to the Pierce Company. Louis Courtemanche testified, "we paid the L. H. Pierce Company $125 commission for selling it." He also said, "We paid our salesman $125 and paid the Pierce Company $125." He also admitted that in a previous deposition he had stated that he had paid the Pierce Company $250. The salesman who received the $125 commission was an employee of Courtemanche. The three defendants were separately incorporated but in the dealings with the plaintiff they appear to have acted as one and we think that under all of the evidence the jury could find that all three defendants through their common vice-president, Louis Courtemanche, cooperated in the alleged conversion. The defendants' brief makes no contention that we should consider the issues as to each defendant separately.

Although the Acceptance Corporation, as mortgagee, was the one who authorized the sale of the trailer, the net proceeds of the sale were turned over to Courtemanche, a separate corporation. The defendants contended that Courtemanche had installed air scales on two of the trucks which were covered by the mortgage and that the plaintiff owed that corporation $1,502.85 as payment therefor. The plaintiff testified that he had a conversation with Louis Courtemanche concerning two International trucks which he ultimately bought from Courtemanche, the corporation. We quote:

"A. * * * he says, 'What about these Internationals?' And I says, 'No, I don't want the Internationals,' I said, 'They are in too bad a shape, and I would have to overhaul them, and it would cost me a lot of money, and there's no tires on them either, so—'Well,' he said,—he led me to believe that I wouldn't get any more if I didn't take those, anyway, and I think they had it figured that those

two were included in the fleet of trucks that I was going to have. So he says, 'I will put these air scales on them free,' he says, 'if you will take these two Internationals.' So the way it looked, I wasn't going to get any other trucks, so I agreed to take them.''

There is additional evidence supporting plaintiff's testimony. The agreed amount to be paid to Courtemanche by the plaintiff was stated in the mortgage to be $102,177.78, which did not include the $1,502.85 item for the air scales.

█ █ The defendant, in a letter dated 25 April, wrote the plaintiff that in rechecking the account they had failed to include the item of $1,502.85. Clearly there was evidence from which the jury could find that the plaintiff did not owe Courtemanche for the air scales and we presume from its verdict that they did so find. It was the claim of the defendants that they were entitled to apply the net proceeds from the sale of the plaintiff's trailer to the reduction of an open account of Courtemanche against the plaintiff on account of his alleged indebtedness for the air scales. Courtemanche notified the plaintiff in writing that "it is Mr. Courtmanche's intention to handle this at the time the details are handled in connection with the sale of your trailer." Much is made of the fact that the plaintiff did not answer this letter in writing, however, he testified as follows:

"A. Well, at the time I got that letter, I didn't write or anything but I—he was down there quite often, and I expected him to be down shortly after, and he did come down; and I asked him, I says, 'What's the idea,' I said, 'of sending me a bill for those air scales when you agreed if I took those two old trucks that he had at McMinnville, you would put them on free?' And I says, 'Not only

that, but' I said, 'that trailer is on the mortgage.' And I said, 'I had a sad experience with Mr. Hansen and Mr. Lee over a previous deal of the same kind of which I had a trailer that I traded for a better one even before the equipment was on the mortgage, and they told me in no uncertain terms that, "Don't you know that any equipment that's on a mortgage you are supposed to apply that money to the mortgage?"' Well, I naturally thought that if that trailer was sold, I certainly wouldn't do anything else but put it on the mortgage."

The record sufficiently presented a jury question, first, as to whether the plaintiff owed anything for the air scales, and second, whether he ever authorized the mortgagee Acceptance Corporation to apply the proceeds for the sale of mortgaged property to the payment of a disputed claim of another or different corporation, or ever acquiesced in any such application. The inherent improbability of a such a transaction was a matter to which the jury could give consideration. We now return to the brief of the defendants wherein it is said:

"The trial court's opinion, which is printed as an appendix hereto * * * is clear and comprehensive. It embodies a ruling based upon the entire record and made in the proper exercise of the trial court's discretion.

"The trial court recognized that the jury was entitled to believe appellant's testimony that he had directed that the trailer proceeds be applied on the mortgage indebtedness, and to disbelieve respondents' evidence that appellant had agreed that this sum might be applied to his open account at L.A.C."

The trial court correctly found that the jury did believe the testimony of the plaintiff. It its opinion upon the motion for judgment n.o.v., the trial court said: "The Court, therefore, at the trial in effect set aside the application of the trailer proceeds to the open account.

To this extent I am satisfied that my decision was correct.'' Thus far we are in agreement with the decision of the trial court. The trial court further found that the plaintiff had not directed the application of the proceeds from the sale of the trailer ''to any particular part of the mortgage debt.'' Since the proceeds could not be applied to the open account with Courtemanche and since the plaintiff had not directed that the payment be applied to any particular instalment of the mortgage debt, it became the duty of the trial court to make the proper application. That court considered three possible applications of the proceeds: (1) To an instalment of the mortgage due at the time of the application or to the first instalment coming thereafter; (2) to the last instalment to become due under the mortgage, or (3) to all of the instalments of the mortgage pro rata. The trial court correctly said:

> ''* * * If applied in accordance with the first method to a current installment, the mortgage was not in default at the time of the repossession, and the repossession constituted a conversion. In such a case the verdict, for compensatory damages at least, must be upheld. If the trailer proceeds should be applied by the Court to the last installment or pro rata upon all installments, the mortgage was in default in a substantial amount at the time of the repossession, and the repossession was rightful and constituted no conversion. In such case the verdict must be set aside.''

At the jury trial the court had instructed, in effect, that unless the jury found that the defendants had proved the existence of an indebtedness for air scales, and that the plaintiff had agreed that the trailer proceeds should be paid to Courtemanche on the open account, then the mortgage was not in default and the defendants would have had no right to take the prop-

erty on account of such alleged default in payment. On the motion for judgment n.o.v., however, the court held, that such application was erroneous and that the proceeds from the sale of the trailer should be applied by it to the last instalment or to all of the unaccrued instalments pro rata.

The defendants, who filed a joint answer, have abandoned the contention made at the trial, and in effect, concede that the jury has disposed of their claim that the proceeds should be applied to the open account of Courtmanche. They now defend the decision of the trial court which was that the application of the proceeds should not be made to the balance due under the mortgage at the time of the seizure, but should be applied to later unaccrued payment or payments. In view of the record and of the verdict of the jury, neither party can now claim the benefit of any estoppel against the other.

■ The general rules which serve as a background to the issue are not in dispute: (1) A debtor who makes payment to his creditor having two or more claims may designate the claim to which the payment is to be applied; (2) if the debtor fails to do so, the creditor may make the application; (3) if neither of them makes the application, then it is the duty of the court to make it.

"* * * we must also have regard to the long settled rule of law that where neither the debtor nor the creditor has applied payments before controversy has arisen the courts will make application of them in a manner to accomplish the ends of justice. * * *" *Korbly v. Springfield Institution for Savings,* 245 US 330, 336.

*Patterson v. Bank of British Columbia,* 26 Or 509, 38 P 817; *Fatland v. Wentworth & Irwin,* 149 Or 277, 40

P2d 68; *C. D. Johnson Lumber Corp. v. Leonard et al.,* 192 Or 639, 227 P2d 179, 232 P2d 804, 236 P2d 926.

■ The pending case falls within class 3. It is true that the creditor, the Acceptance Corporatiton, attempted to apply the credit, but not to any claim belonging to it. When a debtor pays his creditor, the mere fact of payment amounts to an application of the fund to some obligatiton held by that creditor. The rules governing the right of a creditor to determine the application of payments, as between several claims held by him, have no relevancy to attempted application of payments by a creditor to the claims of other creditors.

■ Again, this case is not controlled by the decisions which hold that in the absence of directions from the debtor, the creditor may, at his option, apply payments to an unsecured account rather than to one for which he holds security. Here the creditor had only one claim, all of which was secured. At the trial of the case, the Acceptance Corporation was still attempting to make an unlawful and unauthorized payment to a third party, to wit, to Courtemanche. It is now too late for it to change position by claiming that it has exercised an option to apply the payment from sale of the trailer to unmatured instalments on the mortgage.

> "* * * It is certainly too late for either party to claim a right to make an appropriation after the controversy has arisen, and, a fortiori, at the time of the trial. * * *" *Patterson v. Bank of British Columbia,* supra, 26 Or 509, 521, 38 P 817.

■ In *Fawkes v. Curtis,* 133 Or 20, 286 P 981, an owner negotiated a loan secured by a mortgage on his property, which loan was to be used in constructing a building thereon. The owner then entered into an agreement with the general contractor and he, with a subcontractor, for construction of the building. The owner

owed the contractor in excess of $3,500 and directed the loan company to pay that amount to the subcontractor, who also had a lien on the building. The payment was in reality made to the general contractor. The contractor owed the subcontractor for money loaned, which was unsecured. In apparent agreement with the contractor, the subcontractor attempted to make application of part of the $3,500 to the payment of the unsecured loan. This court held that the money which was received from the building fund on the subcontract should be credited on the subcontractor's lien claim.

> "Where payment is made from a particular fund or source, such payment must be applied to a debt which is a lien upon such fund, or which is a liability against such a source, as against other debts, unless the parties who would be prejudiced by such different application acquiesce therein: 5 Page, Contracts (2d Ed.) § 2844-5, pp. 5028, 5031; Hughes v. Flint, 61 Wash. 460, 462, 112 P. 633; *Harris v. Gilbert,* 46 R. I. 350 (128 A.T.L. 11, 12); Boyer-Van Kuran Lbr. Co. v. Colonial Apts. Co., 94 Neb. 180, 183 (142 N.W. 519); Jordan v. Bank of Morrilton, 168 Ark. 117 (269 S.W. 53)." *Fawkes v. Curtis,* supra, 133 Or 20, 25, 286 P 981.

In *Bowles v. Clark,* 59 Wash 336, 109 P 812, a similar rule was applied.

In the case at bar the plaintiff expressed to the Acceptance Corporation the intention that the proceeds from the sale of the trailer should go to reduce his mortgage debt. Even in the absence of the testimony quoted supra upon that issue, we think there is a reasonable inference that the parties intended that the proceeds from the sale of mortgaged property should go on the mortgage debt and that the credit on the mortgage should, in the ordinary course of business, be given at the time when the Acceptance Corporation received the proceeds from the sale of the trailer. However, the

duty to give credit for the payment at the time of its receipt does not settle the question as to how that credit is to be applied. The issue in the case can become clear only when we compare the schedule of payments which is printed in the defendants' brief with a schedule showing the plaintiff's theory of the case. We quote from the defendants' brief the following:

"For a clearer understanding of the undisputed payments made on the mortgage from the date of its execution to the date of repossession on October 6, 1950, the following schedule is taken from Plf. Ex. 29 and Deft. Ex. 31:

| Due Date | Amount | Date Paid | Amount Paid | Amount Delinquent | Balance |
|----------|--------|-----------|-------------|-------------------|---------|
| | | | | | 102,177.78 |
| 5/25/50 | 5700.00 | | | 5700.00 | 102,177.78 |
| | | 6/5/50 | 2000.00 | 3700.00 | 100,177.78 |
| | | 6/16/50 | 3700.00 | | 96,477.78 |
| 6/25/50 | 5700.00 | | | 5700.00 | 96,477.78 |
| | | 7/14/50 | 2700.00 | 3000.00 | 93,777.78 |
| 7/25/50 | 5700.00 | | | 8700.00 | 93,777.78 |
| | | 7/27/50 | 5400.00 | 3300.00 | 88,377.78 |
| 8/25/50 | 5700.00 | | | 9000.00 | 88,377.78 |
| | | 8/26/50 | 6000.00 | 3000.00 | 82,377.78 |
| | | 9/6/50 | 2850.00 | 150.00 | 79,527.78 |
| 9/25/50 | 5700.00 | | | 5850.00 | 79,527.78 |
| | | 10/4/50 | 4017.87 | 1832.13 | 75,509.91 |

The schedule as set forth in the defendants' brief shows that all payments made by the plaintiff, with the sole exception of the $2,250 payment derived from the sale of the tractor, were applied to the reduction of the balance owing and that the application was made on the dates of the respective payments. The same schedule shows that the defendants credited every payment made, on the day it was made, to the reduction of the amount of delinquency existing on that day.

Following the practice of the defendants which is

evident from the aforesaid schedule, it would appear that the payment of $2,250 which was received on 15 June 1950 should also be credited on the date it was received and that the balance owing should be reduced by that amount on the same date and, as was the case with other payments made after the due date, it should be applied when received, to the reduction of the then-existing delinquency.

We will next set forth the same schedule employing the same figures, dates and application of payment, with this single change; that whereas the defendants' schedule shows no credit for the $2,250, we will enter that sum as a credit on the day on which it was received by the Acceptance Corporation and we will apply it in accordance with the plaintiff's theory. When this is done the only serious issue in the case will become apparent:

| Due Date | Amount | Date Paid | Amount Paid | Amount Delinquent | Balance |
|---|---|---|---|---|---|
| | | | | | 102,177.78 |
| 5/25/50 | 5700.00 | | | 5700.00 | 102,177.78 |
| | | 6/5 | 2000.00 | 3700.00 | 100,177.78 |
| | | 6/15 (trailer) | 2250.00 | 1450.00 (3700.00 —2250.00 1450.00) | 97,927.78 |
| | | 6/16 | 3700.00 | (No delinquency and 2250.00 to apply on 6/25 instalment) | 94,227.78 |
| 6/25 | 5700.00 | | | 3450.00 (5700.00 —2250.00 3450.00) | 94,227.78 |
| | | 7/14 | 2700.00 | 750.00 (3450.00 —2700.00 750.00) | 91,527.78 |
| 7/25 | 5700.00 | | | 6450.00 (5700.00 + 750.00 6450.00) | 91,527.78 |

| Due Date | Amount | Date Paid | Amount Paid | Amount Delinquent | Balance |
|---|---|---|---|---|---|
| | | 7/27 | 5400.00 | 1050.00<br>(6450.00<br>—5400.00<br>1050.00) | 86,127.78 |
| 8/25 | 5700.00 | | | 6750.00<br>(5700.00<br>+1050.00<br>6750.00) | 86,127.78 |
| | | 8/26 | 6000.00 | 750.00<br>(6750.00<br>—6000.00<br>750.00) | 80,127.78 |
| | | 9/6 | 2850.00 | (No delinquency<br>2100.00 paid<br>against Sept.<br>instalment.<br>2850.00<br>— 750.00<br>2100.00) | 77,277.78 |
| 9/25 | 5700.00 | | | 3600.00<br>(5700.00<br>—2100.00<br>3600.00) | 77,277.78 |
| | | 10/4 | 4017.87 | (No delinquency.<br>Surplus of 417.87.<br>4017.87<br>—3600.00<br>417.87) | 73,259.91 |

On 5 October defendants seize property.

From the above schedule it will be seen that payments made by the plaintiff are applied in only two ways; one to reduce a delinquency on the last preceding instalment, and two, as a partial payment on the monthly instalment then accruing but not yet actually due. The following payments were applied only to reduce existing delinquency:

| | |
|---|---|
| 6/5 | 2000.00 |
| 6/15 | 2250.00 |
| 7/14 | 2700.00 |
| 7/27 | 5400.00 |
| 8/26 | 6000.00 |

The following payments were made which eliminated a then-existing delinquency and left a surplus which was in each instance less than the amount which would become due on the 25th of the month in which the payment was made:

| | |
|------|---------|
| 6/16 | 3700.00 |
| 9/6 | 2850.00 |
| 10/4 | 4017.87 |

This case does not involve any question as to the proper application of payments made in excess of the amount currently becoming due. To illustrate: If a note secured by mortgage called for payments of $1000.00 on the 25th of each month and the debtor should pay $5000.00 ten days before the 25th, a serious question might arise as to the debtor's intention or if neither debtor nor creditor made the application, as to the court's duty to apply the excess of $4000.00. This question is not in the pending case and need not be decided or considered.

Here there are required monthly instalments of $5700. On June 16 the debtor paid up his delinquency and paid $2250 on payment of $5700 which was accruing and would be due 9 days later. On 6 September he paid up an overdue instalment and paid $2100 against the $5700 which was accruing and would be due on 25 September. On 4 October he paid up the delinquency which existed on 25 September and paid $417.87 against the instalment which would become due on 25 October if defendants had not seized the property on 5 October.

The question is, how should the court apply payments such as those of 16 June, 6 September and 4 October. If the plaintiff was a day or two late in making the payments due on the 25th of each month the

defendant could seize his property by reason of his breach. Now suppose the plaintiff had paid $5700 on the 23d which was not due until the 25th. Would anyone argue that the plaintiff would be required to pay another $5700 on the 25th in order to avoid delinquency and foreclosure? If a payment made two days early would be applied on the instalment coming due on the 25th, why would not the same rule be applied by the court if a $5700 payment was made at a still earlier time but still within the monthly period during which the instalment of $5700 was accruing. Again, if the plaintiff had paid $5000 on the 23d when $5700 was due on the 25th, would any court hold that he must pay a full instalment of $5700 on the 25th? And if plaintiff would be entitled to credit for his premature partial payment as against the next instalment due when payment was two days early, why not if partial payment was made even earlier but still within the month during which the $5700 instalment was accruing? This view is supported in *Smith v. Renz,* Cal App2d, 265 P2d 160. Plaintiff brought an action for declaratory judgment to determine how a large advance payment of principal made on a promissory note before any instalment was due, should be applied. The case arose between the successors in interest of the maker and the administratrix of the payee. For convenience we will refer to the parties as maker and payee, for their representative capacities are not in question. On 20 June 1947 the maker executed a note to the payee for $148,000 with interest on unpaid principal payable monthly, principal payable in instalments of $500 or more on the first day of each month, beginning on the first day of July 1952. In September 1947 the maker paid $23,500 and the payee acknowledged receipt of that amount on the note. Thus

a distinction between *Smith v. Renz* and the pending case becomes clear.

In *Smith v. Renz* the payment was in excess of the amount which was to become due at the time fixed for the first instalment. In the pending case the payments made in advance were less than the amount of the next accruing instalment. The trial court directed the application of the $23,500 to the first 47 instalments. The California Court of Appeals said:

"When payment is made *on* an obligation, unless there is some indication to the contrary, the practical and ordinary interpretation must undoubtedly be that payment is to be applied to the part first coming due to be paid. No rule or logical reason has been offered as to why, in the ordinary course of events, it should be approached the other way around. * * *

"It would seem also to be stretching rules of construction and reason a bit to say that just because a payment was made in advance of the due date of the first of a number of installments it cannot be considered payment of the installment first coming due, but must, on the contrary, be credited directly to a number of installments which would not fall due for years to come. Appellant contends that this advance payment cannot be credited to an installment first coming due because the note does not provide that payment can be made on *or before* the dates specified. It would seem that this reasoning would apply with equal force to the last 47 installments to which appellant seeks to have the $23,500 applied.

"If appellant's reasoning is sound, the note could be paid in full *on* any of the installment dates because it provides for payments of $500 *or more,* but because it does not provide that payments may be made on *or before* the installment dates, no payment at all can be credited to any *installment* unless paid *on* the actual date. If it be said that this construction is too strict, then where in point of

time is the line of distinction to be drawn? How long prior to the actual due date can a payment be made and still have legal standing as payment of an installment? Would it be a day, a week, or longer? * * *

"In the absence of agreement to the contrary, it is undoubtedly the rule in installment cases providing for the payment of a specific amount *or more* at fixed intervals, that an excess payment made prior to or on one installment date is not effective to reduce the amount of or obviate the necessity of paying subsequent installments as they fall due according to the agreed schedule." *Smith v. Renz,* Cal App2d, 265 Cal2d 160.

The court then distinguished *Harman v. Walsh,* 102 Cal App2d 608, 228 P2d 333, in which payments in excess of the required monthly instalments were made for several months and thereafter the monthly payments made were less than the required amounts. The total amount paid exceeded the amount which was required. But the court held that payments in excess of a monthly requirement did not relieve the debtor from paying the full amount of future instalments. Commenting on *Harman v. Walsh,* the court in *Smith v. Renz* said:

"It will be noted in that part of the opinion just quoted, the court uses the language '* * * only privilege was to pay * * * on the first of any month * * *.' The only question before the court was whether if the payor made an excess payment on one installment he was entitled to have the excess credited on those next successively following. It was held that he was not. The question of payor's right to make advance payment to apply only on the one installment next to become due was not involved. So even if the court there intended, by the use of this language, to restrict the payor's privilege to paying 'on' the actual due date, it would be dicta and not binding as precedent here. Such a rule would be highly impractical, particularly in

those instances where payments are sent by mail or from a distance. Law is reason and as far as is possible it should be tailored to practical living. It is not the purpose of the law to unnecessarily magnify technicalities into practical difficulties, where preferring the practical involves no substantial invasion of legal rights." *Smith v. Renz,* Cal App2d, 265 Cal2d 160.

It was held that the $23,500 must all be considered as an advance payment of the first instalment of $500 or more but that it does not in any wise affect the remaining schedule of instalments provided in the note, other than to lessen the principal sum by that amount and consequently reduce the number of instalments remaining to be paid.

If portions of an excess payment are to be applied on the first instalment, then a fortiorari a payment of less than the next required instalment should be applied to the reduction of the amount becoming due on the next instalment date.

In *Smith v. Renz* neither debtor nor creditor made an actual application of the excess payments. The court decided the case on what it inferred to be the intention of the parties. A similar rule should be applied when under our rule it becomes the duty of the court to make application when neither debtor nor creditor has done so.

In this case it is clear that payments which did not exceed the amount currently due and delinquent should be applied to the reduction of such delinquency. This was the way in which payments were in fact applied by the defendants as their schedule shows. But a different problem is presented when payments are made in excess of the amount of the current delinquency and which excess is less than the amount of the next accru-

ing instalment of $5700. It is necessary to decide whether such excess payments should be applied to the next accruing instalment. But if that decision is in the affirmative it will become unnecessary to decide whether such payments should be applied to that instalment on the day on which each was received or on the 25th of the month following each such payment. It is immaterial to plaintiff's case whether such excess payments be actually applied on the day received or held in suspense and applied a few days later on the 25th of the month. In either case if the excess payments of 16 June, 6 September and 4 October are applied to the next ensuing instalment the result will be that on 4 October there would be no delinquency and this would be true whether the surplus payments were each applied when received or were held in suspense and applied a few days later on the due date of the next instalment.

It is true that in some cases it might be of real importance to determine whether a premature partial payment is to be credited and applied to the next instalment on the day the payment is received or on the day when the next instalment becomes due. In such a case, as for example, where the required instalments are a year or more apart and the payments precede the due date by a long time and interest is to be paid in addition to each instalment, the court would have to decide when the application should be made, neither debtor nor creditor having made it. In that event the court would be compelled to consider the applicability of the rule of law which holds that where the instrument in question calls for payment on a day certain without option to pay at other times, a payee is under no obligation to accept payment prior to the maturity date though he may do so if he wishes. 10 CJS 1002,

Bills and Notes, § 462; *McCarty v. Melinkoff,* 118 Cal App 11, 4 P2d 595; 70 CJS 216, Payment, § 5; *Waits v. Orange Creek Turpentine Corp,* 123 Fla 31, 166 So 449. For the reasons indicated the problem last discussed does not arise in the case at bar.

It has been suggested that under the plaintiff's theory of application of payments the debtor would receive no credit by way of reduced interest by reason of prepayment. The first answer is that interest has been calculated and included in the monthly payments of $5700. The only obligation which the plaintiff assumed was to pay $5700 monthly. The second answer is that for the reasons indicated we do not have to decide when the payment is to be applied. The third is that in determining how justice requires that the application should be made in this case we should compare and consider the consequences of various possible applications. Assuming but not deciding that the application could not be made until the due date, we think justice would be better served by a decision involing a loss of a few days' interest than by one causing a forfeiture of more than $100,000 worth of property.

In the case at bar there never was any payment made, including that of $2250, which equalled or exceeded the amount of the next accruing instalment. *Smith v. Renz,* supra, is authority for the proposition that such excess payment should be applied against the next and accruing instalment. Of course the plaintiff remained obligated to pay succeeding instalments when they became due under the terms of the mortgage. The record shows that there were periods during which the plaintiff was in default but this case has been presented on the theory that the decisive question was the existence or nonexistence of default

in payments at the time of the seizure of the property. We quote from respondents' brief:

"\* \* \* Thus, the court was required to make an application, which neither of the parties had made, in one of three ways: (1) to an installment coming due at the time of the application or the first installment coming due thereafter; (2) to the last installment of the mortgage; or (3) to all of the installments pro rata.

"Only through application No. 1 could the mortgage payments be held not to be in default at the time of the repossession. \* \* \*"

In another place they say:

"\* \* \* the decisive question was whether or not appellant on that date was in default under the terms of the note and chattel mortgage \* \* \*".

Again we quote from their brief:

"Under all these circumstances, the court found that to apply the trailer proceeds to an early installment so as to make the mortgage current at the time of repossession, thus creating a tort where otherwise one would not exist, 'would be manifestly unfair to the defendants.' "

We agree with defendants that application to an early (the next) instalment would make the mortgage current at the time of repossession. But we cannot agree to the illogical statement that we would be "creating a tort where otherwise one would not exist."

It was the duty of the trial court to determine how the $2250 should be applied. By so doing it would not "create a tort". It would merely be following the usual judicial procedure. It would be finding from the law as applied to the facts that defendants had committed a tort. The argument concerning the creation of a tort could with equal force be applied in favor of the plaintiff who might say that by the trial court's de-

cision applying the payment to the last instalment the court created a default by the plaintiff "where otherwise one would not exist" and thereby forfeited over $100,000 worth of property. It is the duty of this court in accordance with the applicable law to determine how the payment of $2250 should be applied. It will not be the court but the conduct of the parties which will constitute a tort or a forfeiture as the case may be. In making the determination we think it would be an injustice to hold that the plaintiff was subject to seizure of all the property which he bought from the defendants plus property of his own which he had added to the mortgage as additional security, when it is admitted that on 4 October he had paid $417.87 more than the total of all accrued instalments and when the seizure of the property occurred on 5 October.

The facts concerning every payment made are not in dispute. In his reply the plaintiff alleged that he had paid to defendants approximately $28,917.87 and had paid sums in excess of all monthly payments theretofore coming due upon said debt. The allegation of payment includes by implication the receipt of the money paid. The undisputed evidence of the defendants shows that they had received $28,917.74 and that the last payment received was made, received and credited on 4 October, the day before the seizure.

■ Before finally determining how the payment should be applied we will consider certain principles which guide a court in applying a payment when neither payor nor payee has made the application. The general rule previously cited is that the application should be made in a manner to accomplish the ends of justice. *Korbly v. Springfield Institution for Savings,* supra, 245 US 330; *Murdock v. Clarke,* 26 P 601, 88 Cal 384.

In *Loeb v. Milner,* 21 Neb 392, 32 NW 205, the plaintiff mortgagor brought an action against the mortgagee for the conversion of mortgaged property, as was done in the case at bar. The court said:

> "* * * The right to take possession of the property at any time, reserved in the mortgage, did not authorize the mortgagee to apply the proceeds arising from the sale of same, even if the sale was authorized, to the payment of the note before it became due. Yet the defendants below, in plain violation of their duty to the mortgagor, sold the property, and, without his consent, applied the proceeds to the payment of a note that was not due for nearly a year afterwards. This they had no authority to do."

It was held that the mortgagee was liable for conversion.

In *Anspacher v. Utterback's Administrator,* 252 Ky 666, 68 SW2d 15, the court said that the rule authorizing the creditor to apply a payment to either of two debts at her option "is subject to the exception that, if only one of the debts was due at the time of the payment of the $18,386.03, or any part thereof, it was the duty of Mrs. Anspacher to apply its payment to the due debt. *Bacon v. Brown,* 1 Bibb, 334, 4 Am. Dec. 640."

A payment of the proceeds from the sale of mortgaged property should be applied to instalments due rather than to those not yet due. *City of Louisa v. Horton,* 263 Ky 739, 93 SW2d 620; *Cain v. Vogt,* 138 Iowa 631, 116 NW 786; *International Harvester Co. v. Holmes,* 165 Wis 506, 162 NW 925. In our consideration of this aspect of the case we quote the following:

> "Proceeds derived from the mortgage security must be applied in payment of the mortgage debt, in the absence of any agreement to the contrary

with the mortgagor. The creditor has no option in such case to apply the proceeds to any other debt, as he has in case of a voluntary and general payment. * * *'' 2 Jones, Chattel Mortgages and Conditional Sales, § 640, p 400.

''A creditor may apply at his option, to the payment of any instalment of the mortgage *debt then due,* the proceeds of personal property mortgaged as collateral security, and sold under a power to satisfy the debt, in the absence of any right reserved to the debtor to make the appropriation. * * *'' 2 Jones, Chattel Mortgages and Conditional Sales, § 641, p 401. (Italics ours.)

The rule has been applied when the duty arises in actions at law as well as in suits in equity. *Monidah Trust v. Hruze,* 62 Mont 444, 205 P 232.

''* * * It is for the jury to apply a payment under the evidence before them and the direction of the court.'' 40 Am Jur 805, Payment, § 129.

*Neal v. Gideon,* 157 Kan 1, 138 P2d 419; *Importers' & Exporters' Ins. Co. v. Fidelity & Deposit Co.,* 45 Ariz 237, 42 P2d 409.

The next question is well stated in *Standard Surety & Casualty Co. v. United States,* 154 F2d 335, 164 ALR 935 (CCA, 10th):

''In determining whether the court correctly applied the payments to the Gulfport and Camp Bainbridge projects, it is necessary to determine whether the court should consider the equities of the case as they existed at the time the payments were made or whether it should also consider any change in the status of the parties and of the accounts which had arisen since the payment was made in reaching its conclusion as to what was fair, just and equitable between the parties.''

In considering the question the court quoted from *London & S.F. Bank v. Parrott,* 125 Cal 472, 58 P 164,

where it was said, " 'The circumstances which are to guide the court may have arisen since the payment was made' ". The Federal Court then cited *Thompson v. Bank of Buckhead*, 47 Ga App 767, 171 SE 465, 466, where it was held that the court should consider circumstances which have arisen since the payment was made as well as those existing at the time in determining what was just and equitable.

The Federal Court then stated its conclusion as follows:

> "In reaching its determination as to the manner in which the payments are to be applied, a court should take into consideration all circumstances of the case, those that existed at the time of the payment as well as those that have arisen since. Any other rule would result in inequity rather than equity when the court applied the payment, and would lend aid to one party at the expense of the other. * * *"

It is also held that

> "When the intention of the parties can be determined with reasonable certainty, the court will apply an undirected payment accordingly. And in case an expressed intention cannot be found, one may be implied from the circumstances of the case. Every presumption and rule which the courts have adopted in furtherance of their purpose to discover the 'justice of each case' is subordinate to this rule of intention. * * *" 40 Am Jur 804, Payment, § 130.

In *Importers' & Exporters' Ins. Co. v. Fidelity & Deposit Co.*, supra, plaintiff brought an action on an indemnity bond. The court said:

> "The evidence further discloses that in 1931 MacMillan paid on his indebtedness of $7,550.41 for the period, July 1, 1929, to May 31, 1930 $2,000 (in installments of $200 and $500 each) and that he did not direct that it be applied upon any par-

ticular portion of this account. In a situation of this kind the rule of law applicable is that the payment be appropriated to the oldest debt, that is, 'the debt first becoming due.' 48 C. J. 656, par 110. * * *"

Again, in the Restatement of Contracts, we read:

"Where more than one matured contractual duty is owed to the same person and these duties are for performances of identical character, such as the payment of money, a payment or other performance capable of discharging in whole or in part either one or another of these duties, is applied, subject to the rules stated in §§ 388-393,

* * * * *

"(c) if neither the debtor nor creditor makes a seasonable manifestation of intention as a just regard to its effect upon the debtor, the creditor, and third persons makes it desirable that it should be applied.

* * * * *

"Comment on Clause (c):

"This clause is amplified and illustrated by the rules stated in § 394. The present Clause states the general principle underlying the more specific rules of § 394, and serves also as a guide in cases not falling within the rules stated in the latter Section."
Restatement of the Law, Contracts, § 387, pp 729 and 736.

Section 394 does not discuss the problem presented by the particular facts in the pending case. The general rule is stated thus:

"(1) Where neither the debtor nor the creditor seasonably exercises his power to apply a payment to one of several debts, the payment is applied to the earliest matured debt to which the creditor might have applied it, except that application is made to

(a) a matured debt which the debtor is under a duty to a third person immediately to pay,

rather than to one where he is under no such duty; or

(b) if he is under no such duty,

 (i) to overdue interest rather than to principal; and

 (ii) to an unsecured or precarious matured debt rather than to one that is secured or certain of payment.

(2) If the rules stated in Subsection (1) afford no ground for differentiating matured debts a payment not applied by either debtor or creditor is applied ratably to all matured debts." Restatement of the Law, Contracts, § 394, p 743.

The exceptions in section 394 do not cover the facts in the pending case and the general rule therefor applies.

"\* \* \* Every presumption and rule which the courts have adopted in furtherance of their purpose to discover the 'justice of each case' is subordinate to this rule of intention. Accordingly, it is held that the court will not apply payments, which he had not intended to pay except by way of setoff, upon a claim against the other parties to the transaction." 40 Am Jur 804, Payment, § 130.

Applying these principles we have first the rule that proceeds from mortgaged property should be applied to the mortgage debt. We next consider the guiding rule requiring search for the implied intention of the parties. The plaintiff's intention was expressly indicated and was also clearly implied. On the contrary, the defendants' intention was to make an unlawful application to the debt of a third party not the creditor holding the security. Under these conditions the court should follow the express or implied intention of the debtor.

Again, the rule which directs the court to consider not only the situation existing at the time of the payment but also the situation arising after the pay-

ment but before the litigation arose, suggests an application favorable to the plaintiff. The court is to apply the payment as a "just regard to its effect upon the debtor, the creditor and third persons makes it desirable that it should be applied." Here the question in its simplest form is this: Should the payment be applied to the claim of Courtemanche Acceptance Corporation before or after 5 October when the forfeiture was declared? The court should under the authorities cited consider the issue in the light of the facts existing immediately before the forfeiture. Considering them as of that time, the court could know from the undisputed facts that application of the payment to any claim maturing after 5 October would be impossible because after that date plaintiff would have lost all interest in property of great value. Applying the disputed payment, however, to the current obligations which had matured before forfeiture would prevent an abhorred forfeiture and still preserve the rights of the defendants in the security. These and other considerations suggested by the authorities cited dictate that we should hold that the $2250 disputed payment should be applied at least at some time prior to the date of forfeiture. If this is not "justice", we are at a loss to know what is.

 We conclude that payments derived from the sale of mortgaged property must be applied to the mortgage debt in the absence of agreement to the contrary, and that such funds should be applied to debts due rather than to unmatured claims. This conclusion is strongly fortified when applied to the particular facts of the case at bar. It requires no argument to demonstrate that any mortgagor would intend that his payments be applied so as to keep the mortgage in good standing, and that such payments should not be applied to an instalment not yet due if the result would be to

put the mortgagor in default, thereby entitling the mortgagee immediately to seize all of the mortgaged property and foreclose by private sale. The so-called purchase price was $102,177.78, but that sum included an item of $12,142.75, which represented financing charges and prepaid interest. Under the trial court's decision, the $2,250 derived from the sale of the trailer was applied on the last instalment of the mortgage or was applied pro rata on all of the matured instalments. It is impossible to determine which alternative the trial court adopted. Its decision placed the plaintiff in default and entitled the mortgagee to foreclose and sell the property. Furthermore, if the proceeds had proved insufficient to satisfy the unpaid balance, the mortgagee, under the mortgage, could have taken judgment for the balance which would have included interest calculated on the unpaid instalments which would have matured between 6 October 1950, the date of the conversion, and 25 October 1951, the date set for the final payment on the mortgage.

Under the evidence in this case, and the facts as determined by the verdict of the jury, we hold that the trial court erred in granting judgment for the defendants notwithstanding the verdict. The credit for the trailer should have been applied on the mortgage when that money was received, or at least at the time when the next instalment became due. Had that been done, the plaintiff would not have been in default on 6 October. The result is that the defendants were guilty of converting the property.

After granting the judgment n.o.v., the trial court also held that the evidence did not sustain any award of punitive damages. That issue had been raised by the defendants who had moved that in the event that it should be found that the defendants had converted

the property the judgment for compensatory and punitive damages be set aside and judgment entered for "general damages alone, to wit, $9,240.69" for the reason that there was no substantial evidence to support the award of punitive damages. If this court were authorized to exercise its common law powers, we would unhesitatingly hold that the award of $35,000 as punitive damages was excessive and it may be that the trial court was unconsciously influenced by the same conviction in its ruling upon the motion for judgment n.o.v. But unless this court is ready to overrule *Van Lom v. Schneiderman,* 187 Or 89, 210 P2d 461, as applied to punitive damages, we must hold that under the constitution, Article VII, § 3, we are without power to consider whether or not the punitive damages were excessive, and we must uphold the verdict whether deemed excessive or not, unless we find other error authorizing the granting of a new trial. We will not labor the issue here which was discussed pro and con in the Van Lom case. Applying the ruling of that case as law, our only question for determination is whether there was any substantial evidence of malice. The rule in this jurisdiction is well set forth in the ruling of *Green v. Leckington,* 192 Or 601, 609, 236 P2d 335, where it is said:

> "* * * We have laid down the rule that to be entitled to exemplary damages, plaintiff must show malice or guilty intent on the part of defendant or other circumstances of aggravation, and, if he acted in good faith, exemplary damages are not recoverable. Martin v. Cambas, 134 Or. 257, 261, 293 P 601; Van Lom v. Schneiderman, 187 Or. 89, 210 P.2d 461, 11 A.L.R.2d 1195. In the Martin case, the police violated the law in arresting the plaintiff, yet, since they acted in good faith, they were not subjected to exemplary damages."

Under the ruling of that case we would be authorized to affirm the judgment for compensatory damages and set aside the judgment for punitive damages if we should find that there was no substantial evidence on the latter issue. We are, however, compelled to find that there was evidence from which the jury could, and did, find that the defendants deliberately misapplied his payment of $2,250 to a claim to which it could not lawfully be applied. There is evidence that the defendants' representatives made inconsistent statements concerning the disposition of the $250 commission which was paid on the sale of the trailer. There is evidence relative to the payment of $6,000 made by Mr. Powell to the Acceptance Corporation of 25 August 1950. Plaintiff testified:

"A. After we started in down there at Powell's, we had a meeting in Mr. Felker's office when these agreements were drawn up, and that's when Mr. Powell paid Mr. Courtemanche $6,000, and we drew these agreements —

"Q. Well, what was said at that time, anything in particular?

"A. Well, no, only before this or when Powell made the arrangements to give him this $6,000, I called him up.

"Q. You called who up?

"A. Mr. Courtemanche in McMinnville.

"Q. Yes.

"A. (Continuing) And asked him if I could use part of that to pay my Union Oil bill that I had accumulated before when I was at Welch's, and he said, 'No, you can't have any of it.' Well, I had moved all my equipment from Roseburg down to Canyonville, and I wanted to pay something on my bill there because I was moving out of Roseburg, and so I called him up and it cost me $11 telephone bill to see if I could use some of that money to pay on my Union Oil bill, and he said, 'No,' he said,

'you can't have any of that.' And I says, 'Well, how do you expect me to pay my bills, then? I've got to pay my fuel bills to operate.' 'Well,' he says, 'you can always go bankrupt,' he said. And I said Well, that was a nice thought, and I hung up.''

There was evidence concerning the agreement whereby Powell would pay $6,000 to the Acceptance Corporation, concerning which the plaintiff testified:

''A. And so then everything seemed to be all right. They went ahead and made arrangements to take everything I had, that is, everything over and above the bills. The actual cost of operating the trucks was to be paid by Mr. Courtemanche. And I said, 'Well, where do I come in at? I still have to eat a little bit.' 'Oh,' he says, 'you eat bread and water this winter,' he says. So I said, 'Well, O.K.' So I went ahead, then, and tried to, well, do something with the job.''

There is evidence that Mr. Hansen for the Acceptance Corporation demanded $3,000 of the plaintiff, who explained that he had no money in the bank at that time. Upon the demand, however, the plaintiff issued a $3,000 check upon Hansen's agreement that he would not cash it until after plaintiff's next payday. There is further evidence that the check was sent through the bank in violation of that agreement. There is also evidence, which is disputed, to the effect that Louis Courtemanche insisted that plaintiff continue trucking for a logger, Welch, when it was apparent that the volume of trucking for Welch was insufficient to make possible plaintiff's payments on the mortgage, when there were other and allegedly better opportunities for the use of the trucks elsewhere. The undisputed evidence is that the trucks were retaken without notice to the plaintiff and without his knowledge. We express no opinion as to whether the defendants were activiated by malice,

or whether there was a wilful and wanton disregard of plaintiff's property rights. We say only that the evidence presented an issue for the decision of the jury.

The authorities are adequately reviewed in *Perry v. Thomas et al.,* 197 Or 374, 253 P2d 299. See also *McCarthy v. General Electric Co., et al.,* 151 Or 519, 49 P2d 993; *Pelton v. General Motors Acceptance Corporation,* 139 Or 198, 7 P2d 263 9 P2d, 128. We hold that there was substantial evidence authorizing the jury in its discretion to award punitive damages.

■■■■■ We must next consider the defendants' cross appeal from the order denying the defendants' motion for a new trial. A motion for a new trial was properly filed by the defendants, with the request that it be considered, if the court should deny the motions for judgment n.o.v., and for the elimination of punitive damages. Our first inquiry is whether we are authorized to consider the merits of the motion for a new trial. Under ORS 19.010 the right of appeal is given as to an order setting aside a judgment and granting a new trial, and it is not given as to orders denying a motion for new trial. Under that statute we have repeatedly held that no appeal will lie from an order denying a motion for a new trial, but in 1945, new legislation effected a material change in the law. ORS 18.140 incorporates the 1945 amendment and reads in part as follows:

"A motion in the alternative for a new trial may be joined with a motion for judgment notwithstanding the verdict, and unless so joined shall, in the event that a motion for judgment notwithstanding the verdict is filed, be deemed waived. When both motions are filed, the motion for judgment notwithstanding the verdict shall have precedence over the motion for a new trial, and if granted the court shall, nevertheless, rule on the motion for a

> new trial and assign such reasons therefor as would apply had the motion for judgment notwithstanding the verdict been denied, and shall make and file an order in accordance with said ruling." ORS 18.140 (3).

The motion of the defendants for new trial was joined with their motion for judgment n.o.v., pursuant to the provisions of this statute. They could not appeal from the judgment for the plaintiff because it had been set aside. They could not appeal from the judgment n.o.v. for it was in their favor. Under the statute, if a motion for new trial is not joined with the motion for judgment n.o.v., it is waived. The clear intent of the statute is, that if both motions are joined, there is no waiver. The provision of the statute which requires the trial court to consider first the motion for judgment n.o.v. and which provides that if granted, the court shall, nevertheless, rule on the motion for new trial "and assign such reasons therefor as would apply had the motion for judgment notwithstanding the verdict been denied" clearly manifests the legislative intent that if this court reverses the judgment n.o.v., there shall be available to us a record from which we may determine whether there is merit in the errors assigned in the motion for a new trial. The trial court, in an abbreviated manner, complied with the requirement of the statute and held that the motion for a new trial was not well taken "in that such other error as may have occurred during the trial would not in and of itself justify the granting of a new trial." We are of the opinion that the merits of the motion for a new trial are before us for consideration and we hold that under these circumstances the right to appeal from the adverse decision of the trial court on the motion for a new trial is granted by implication. If an appeal

could not be taken from the order denying a new trial, there would be no way by which this court could reach prejudicial errors apparent on the face of the record.

In the ordinary case, an appellant against whom a verdict and judgment have been taken and whose motion for a new trial has been denied, can appeal from the judgment and may take advantage of errors of law occurring at the trial if he has properly preserved his rights. Not so in the case now under consideration. See discussions: *Varley v. Consolidated Timber Co.,* 172 Or 157, 139 P2d 584; *Montgomery Ward & Co. v. Duncan,* 311 US 243, 85 L ed 147. The defendants' only opportunity to complain of adverse rulings at the trial was to appeal from the denial of their motion. They may then raise in this court such issues as they have presented in the motion and as they have preserved at the trial.

The first assignment of error in the defendants' cross appeal relates to the emotional appeal of the plaintiff in his final argument, but the court properly instructed the jury to disregard the offensive portion thereof and we cannot say that the nature of the argument established that the verdict was the product of passion or prejudice.

The second assignment of error complains of the failure of the trial court to give the following requested instruction:

"I instruct you that the law never presumes that one accused of conversion is guilty thereof. The presumption is to the contrary, that is, that one accused of doing a wrongful act is innocent of such accusation. Such a presumption is evidence in favor of the defendants which abides with them throughout the trial of this case and your deliberation on the facts, until such time, if ever, as sub-

stantial evidence may convince you to the contrary.''

Under the authorities which now have been definitely established despite earlier disagreement the failure to give this instruction on request was error. *Wyckoff v. Mutual Life Insurance Co. of New York,* 173 Or 592, 147 P2d 227; *Ritchie v. Thomas,* 190 Or 95, 224 P2d 543; *State of Oregon v. Garver,* 190 Or 291, 225 P2d 771.

■■ The trial court also gave an instruction as follows:

"The defendants herein, the three defendant corporations, admit that the property was taken, but they claim that it was taken because there was a default in the mortgage which gave them a right to take it. The burden of proving this justification rests upon the several defendants, all the defendants in the case, and if the defendants satisfy you that a condition was broken in the manner claimed by the defendants, then their taking of the property would be justified and proper; and if the evidence doesn't so satisfy you, then their taking of the property would be wrongful and would constitute a conversion."

An exception was taken and is preserved in the bill of exceptions, although it is not urged in the respondents' brief. The instruction and the exception are set forth in the printed abstract of record but were perhaps inadvertently not discussed in the respondents' brief on the cross appeal. The instruction given was in direct violation of the ruling of this court in *Pelton v. General Motors Acceptance Corporation,* 139 Or 198, 207, 7 P2d 263, 9 P2d 128, where the court, upon rehearing, said:

"We agree that under a general denial the defendant had the right to attack the title of the plain-

tiff or his right to possession of the automobile by offering in evidence anything which would tend to refute the allegations of ownership or the right to possession. * * *"

The instruction was prejudicial and erroneous. Under the circumstances of this case, we deemed it proper to invoke Rule 2 of this court which authorizes us to take notice of an error of law apparent on the face of the record, in the interest of justice and fair trial.

The judgment of the trial court is set aside and a new trial granted.